GRIFFIN, Circuit Judge.
*915 This case arises out of the infamous government-created environmental disaster commonly known as the Flint Water Crisis. As a cost-saving measure until a new water authority was to become operational, public officials switched the City of Flint municipal water supply from the Detroit Water and Sewerage Department (DWSD) to the Flint River to be processed by an outdated and previously mothballed water treatment plant. With the approval of State of Michigan regulators and a professional engineering firm, on April 25, 2014, the City began dispensing drinking water to its customers without adding chemicals to counter the river water's known corrosivity.
The harmful effects were as swift as they were severe. Within days, residents complained of foul smelling and tasting water. Within weeks, some residents' hair began to fall out and their skin developed rashes. And within a year, there were positive tests for E. coli, a spike in deaths from Legionnaires' disease, and reports of dangerously high blood-lead levels in Flint children. All of this resulted because the river water was 19 times more corrosive than the water pumped from Lake Huron by the DWSD, and because, without corrosion-control treatment, lead leached out of the lead-based service lines at alarming rates and found its way to the homes of Flint's residents. The crisis was predictable, and preventable. See generally Mason v. Lockwood, Andrews & Newnam, P.C. , 842 F.3d 383, 387 (6th Cir. 2016).
I.
Plaintiffs Shari Guertin, her minor child E.B., and Diogenes Muse-Cleveland claim personal injuries and damages from drinking and bathing in the lead-contaminated water. Plaintiffs' complaint asserted various claims against numerous state, city, and private-actor defendants. In response to motions to dismiss, the district court granted in part and denied in part the motions. In its written order, the court dismissed many of the original claims and original defendants. Plaintiffs have not filed a cross appeal. The defendants who were not dismissed now appeal and are collectively referred to as "defendants" throughout this opinion. The plaintiffs' sole remaining claim is that defendants violated their right to bodily integrity as guaranteed by the Substantive Due Process Clause of the Fourteenth Amendment. They bring this claim pursuant to 42 U.S.C. § 1983, under which "an individual may bring a private cause of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." Wurzelbacher v. Jones-Kelley , 675 F.3d 580, 583 (6th Cir. 2012).
II.
On this appeal, we decide two substantial issues of public importance. First, viewing each defendant individually, did the district court err in denying defendants' motions to dismiss based upon qualified immunity? Specifically, did plaintiffs plead a plausible Fourteenth Amendment *916 Due Process violation of their right to bodily integrity and was such a constitutional right clearly established when the defendants acted? We join the United States District Court for the Eastern District of Michigan, In re Flint Water Cases , 329 F.Supp.3d 369 (E.D. Mich. 2018), vacated on other grounds (Nov. 9, 2018), and Guertin v. Michigan , 2017 WL 2418007 (E.D. Mich. June 4, 2017), the Michigan Court of Appeals, Mays v. Snyder , 323 Mich.App. 1, 916 N.W.2d 227 (2018), and the Michigan Court of Claims, Mays v. Snyder , No. 16-000017-MM (Mich. Ct. Cl. Oct. 26, 2016),[1] in holding that plaintiffs have pled a plausible Due Process violation of bodily integrity regarding some of the defendants. For the reasons that follow, we affirm the district court's order denying the motions to dismiss based upon qualified immunity regarding defendants Howard Croft, Darnell Earley, Gerald Ambrose, Liane Shekter-Smith,[2] Stephen Busch, Michael Prysby, and Bradley Wurfel. However, we reverse the denial of the motions to dismiss regarding defendants Daniel Wyant, Nick Lyon, Eden Wells, Nancy Peeler, and Robert Scott because plaintiffs' complaint alleges mere negligence, and not a constitutional violation against them.
The second issue is whether the City of Flint is entitled to Eleventh Amendment immunity from plaintiffs' suit because the takeover by the State of Michigan of the City of Flint pursuant to Michigan's "Emergency Manager" law transformed the City into an arm of the state. It is not, and we therefore affirm the district court's same holding.
III.
We possess jurisdiction under 28 U.S.C. § 1291 and the "collateral-order doctrine," as defendants are appealing the denial of qualified and Eleventh Amendment immunity. Kaminski v. Coulter , 865 F.3d 339, 344 (6th Cir. 2017). The district court granted in part and denied in part defendants' motions to dismiss plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6). Given this procedural posture, we construe the complaint in the light most favorable to plaintiffs, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in plaintiffs' favor. Crosby v. Univ. of Ky. , 863 F.3d 545, 551-52 (6th Cir. 2017). But if we are to affirm, the factual allegations in plaintiffs' complaint must plausibly allege a legally recognized constitutional claim. See generally Bell Atl. Corp. v. Twombly , 550 U.S. 544, 556-58, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
IV.
Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald , 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It is not a "mere defense to liability"; the doctrine provides "immunity from suit ." Mitchell v. Forsyth , 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). This immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," "protect[ing] all but the plainly incompetent or those who knowingly violate the law."
*917 Ashcroft v. al-Kidd , 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted). A plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. Bletz v. Gribble , 641 F.3d 743, 750 (6th Cir. 2011). To do so, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." al-Kidd , 563 U.S. at 735, 131 S.Ct. 2074 (internal quotation marks omitted). The district court concluded plaintiffs met this standard, and we review that decision de novo. Sutton v. Metro. Gov't of Nashville & Davidson Cty ., 700 F.3d 865, 871 (6th Cir. 2012).
The assertion of qualified immunity at the motion-to-dismiss stage pulls a court in two, competing directions. On the one hand, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Pearson v. Callahan , 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted). But on the other, "[w]hen qualified immunity is asserted at the pleading stage," as defendants did here, "the precise factual basis for the plaintiff's claim or claims may be hard to identify." Id. at 238-39, 129 S.Ct. 808 (citation omitted). We have thus cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although ... entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." Wesley v. Campbell , 779 F.3d 421, 433-34 (6th Cir. 2015) (internal citations, quotation marks, and brackets omitted). The reasoning for our general preference is straightforward: "Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not" for purposes of determining whether a right is clearly established. Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist. , 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) (brackets omitted).
V.
The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST . amend. XIV, § 1. Flowing directly from the protections enshrined in the Magna Carta, see, e.g. , Lewellen v. Metro. Gov't of Nashville & Davidson Cty. , 34 F.3d 345, 348 (6th Cir. 1994), the Due Process Clause significantly restricts government action-its core is "prevent[ing] government from abusing its power, or employing it as an instrument of oppression." Collins v. City of Harker Heights , 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (internal quotation marks and brackets omitted); see also Cty. of Sacramento v. Lewis , 523 U.S. 833, 845-46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("The touchstone of due process is protection of the individual against arbitrary action of government, [including] the exercise of power without any reasonable justification in the service of a legitimate government objective." (internal quotation marks omitted) ). Although the Clause provides no guarantee "of certain minimal levels of safety and security," it expressly prohibits deprivations by "the State itself." DeShaney v. Winnebago Cty. Dep't of Soc. Servs. , 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). That is, "[i]ts purpose [is] to protect the people from the State, not to ensure that the State protect[ ] them from each other." Id. at 196, 109 S.Ct. 998.
There are procedural and substantive due process components. See *918 Range v. Douglas , 763 F.3d 573, 588 (6th Cir. 2014). Only the latter component is at issue here. Substantive due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams , 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). It "specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Washington v. Glucksberg , 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotation marks and citations omitted). The liberty interests secured by the Due Process Clause "include[ ] the right 'generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.' " Ingraham v. Wright , 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quoting Meyer v. Nebraska , 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) ). These common-law privileges, the Supreme Court has held, specifically embrace the right to bodily integrity, Glucksberg , 521 U.S. at 720, 117 S.Ct. 2258, and the right not to be subjected to arbitrary and capricious government action that "shocks the conscience and violates the decencies of civilized conduct." Lewis , 523 U.S. at 846-47, 118 S.Ct. 1708 (internal quotation marks omitted).
The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." Collins , 503 U.S. at 125, 112 S.Ct. 1061. Substantive Due Process is not "a rigid conception, nor does it offer recourse for every wrongful action taken by the government." EJS Props., LLC v. City of Toledo , 698 F.3d 845, 862 (6th Cir. 2012). As such, it "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." Daniels , 474 U.S. at 332, 106 S.Ct. 662. That means a " 'careful description' of the asserted fundamental liberty interest" is essential, Glucksberg , 521 U.S. at 721, 117 S.Ct. 2258 (citation omitted), otherwise the Clause would turn into "a font of tort law to be superimposed upon whatever systems may already be administered by the States." Daniels , 474 U.S. at 332, 106 S.Ct. 662 (citation omitted). Accordingly, we "focus on the allegations in the complaint to determine how [plaintiffs] describe[ ] the constitutional right at stake and what the [defendants] allegedly did to deprive [them] of that right." Collins , 503 U.S. at 125, 112 S.Ct. 1061.
A.
Plaintiffs' complaint deals with the scope of the right to bodily integrity, an indispensable right recognized at common law as the "right to be free from ... unjustified intrusions on personal security" and "encompass[ing] freedom from bodily restraint and punishment." Ingraham , 430 U.S. at 673-74, 97 S.Ct. 1401 ; see also Davis v. Hubbard , 506 F.Supp. 915, 930 (N.D. Ohio 1980) ("In the history of the common law, there is perhaps no right which is older than a person's right to be free from unwarranted personal contact." (collecting authorities) ).
This common law right is first among equals. As the Supreme Court has said: "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Union Pac. Ry. Co. v. Botsford , 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) ; cf.
*919 Schmerber v. California , 384 U.S. 757, 772, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ("The integrity of an individual's person is a cherished value of our society."). Absent lawful authority, invasion of one's body "is an indignity, an assault, and a trespass" prohibited at common law. Union Pac. Ry ., 141 U.S. at 252, 11 S.Ct. 1000. On this basis, we have concluded "[t]he right to personal security and to bodily integrity bears an impressive constitutional pedigree." Doe v. Claiborne Cty. , 103 F.3d 495, 506 (6th Cir. 1996).
"[T]his right is fundamental where 'the magnitude of the liberty deprivation that the abuse inflicts upon the victim strips the very essence of personhood.' " Kallstrom v. City of Columbus , 136 F.3d 1055, 1063 (6th Cir. 1998) (quoting Doe , 103 F.3d at 506-07 ) (brackets and ellipsis omitted). "We have never retreated ... from our recognition that any compelled intrusion into the human body implicates significant, constitutionally protected ... interests." Missouri v. McNeely , 569 U.S. 141, 159, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013) (emphasis added); see also Rochin v. California , 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (forcibly pumping a detainee's stomach to obtain evidence was "too close to the rack and the screw to permit of constitutional differentiation"). And more broadly, it is beyond debate that an individual's "interest in preserving her life is one of constitutional dimension." Nishiyama v. Dickson Cty. , 814 F.2d 277, 280 (6th Cir. 1987) (en banc), abrogated on other grounds as recognized in Jones v. Reynolds , 438 F.3d 685, 694-95 (6th Cir. 2006).
Bodily integrity cases "usually arise in the context of government-imposed punishment or physical restraint," but that is far from a categorical rule. Kallstrom , 136 F.3d at 1062 (collecting cases). Instead, the central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body. See, e.g. , Cruzan v. Dir., Missouri Dep't of Health , 497 U.S. 261, 269-70, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Thus, to show that the government has violated one's right to bodily integrity, a plaintiff need not "establish any constitutional significance to the means by which the harm occurs[.]" Boler v. Earley , 865 F.3d 391, 408 n.4 (6th Cir. 2017). That is because "individuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest." Planned Parenthood Sw. Ohio Region v. DeWine , 696 F.3d 490, 506 (6th Cir. 2012).
A few examples illustrate the breadth of this tenet. Consider Washington v. Harper , which addressed the State of Washington's involuntary administration of antipsychotic medication to an inmate without a judicial hearing. 494 U.S. 210, 213-17, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). There, the Supreme Court had "no doubt" that the inmate "possess[ed] a significant liberty interest in avoiding unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Id. at 221-22, 110 S.Ct. 1028. This "interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial. The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." Id. at 229, 110 S.Ct. 1028 (citing Winston v. Lee , 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), and Schmerber , 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 ). And this is especially so when the foreign substance "can have serious, even fatal, side effects" despite some therapeutic benefits. Id. But the extent of this interference, reasoned the Court, is circumscribed by the government's interest (there, administering *920 medication in the custodial setting). Id. at 222-27, 110 S.Ct. 1028. Examining those interests, the Court permitted the physical intrusion upon a showing of certain circumstances-danger to self or others, and in the inmate's medical interest. Id. at 227, 110 S.Ct. 1028 ; see also Riggins v. Nevada , 504 U.S. 127, 135-38, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (applying Harper to the forced administration of drugs in trial and pretrial settings and focusing upon the state's "overriding justification and a determination of medical appropriateness" to justify the intrusion); Sell v. United States , 539 U.S. 166, 177-86, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (similar).
The Supreme Court's seminal "right to die" case, Cruzan v. Director, Missouri Department of Health , provides further explication. At issue in Cruzan was whether the parents of an individual in a persistent vegetative state could insist that a hospital withdraw life-sustaining care based on her right to bodily integrity. 497 U.S. at 265-69, 110 S.Ct. 2841. Writing for the Court, Chief Justice Rehnquist extensively detailed the line between the common law, informed consent, and the right to bodily integrity: "This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment," id. at 269, 110 S.Ct. 2841, "generally encompass[es] the right of a competent individual to refuse medical treatment," id. at 277, 110 S.Ct. 2841, and is a right that "may be inferred from [the Court's] prior decisions." Id. at 278-79, 110 S.Ct. 2841 (citing Jacobson v. Massachusetts , 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) ; Breithaupt v. Abram , 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) ; Harper , 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 ; Vitek v. Jones , 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) ; and Parham v. J.R. , 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ). And, although the Court assumed as much, "the logic of [these] cases ... embrace[s] ... a liberty interest" in "artificially delivered food and water essential to life." Id. at 279, 110 S.Ct. 2841. As with Harper , the Court's main inquiry was not whether the case dealt with the right to bodily integrity, but rather how to balance this right with a competing state interest (the protection of life) in relation to the procedural protections provided (the state's requirement that an incompetent person's wishes to withdraw treatment be proven by clear and convincing evidence). Id. at 280-87, 110 S.Ct. 2841 ; cf. Winston , 470 U.S. at 759, 105 S.Ct. 1611 (holding that a non-consensual "surgical intrusion into an individual's body for evidence" without a compelling state need is unreasonable).
This nonconsensual intrusion vis-à-vis government interest line of cases has played out time and time again in the lower courts. See, e.g. , United States v. Brandon , 158 F.3d 947, 953 (6th Cir. 1998) ("[T]he issue of forced medication implicates ... [the] liberty interest in being free from bodily intrusion.").[3] The numerous cases involving government experiments on unknowing and unwilling patients provide a strong analogy to the Flint Water Crisis.[4] Involuntarily subjecting nonconsenting individuals to foreign substances *921 with no known therapeutic value-often under false pretenses and with deceptive practices hiding the nature of the interference-is a classic example of invading the core of the bodily integrity protection.
In re Cincinnati Radiation Litigation is a good example. Funded by the Department of Defense, government officials at the University of Cincinnati subjected cancer patients to radiation doses consistent with those expected to be inflicted upon military personnel during a nuclear war. 874 F.Supp. at 802-04. The patients were in "reasonably good clinical condition," and were "primarily indigent, poorly educated, and of lower than average intelligence." Id. at 803. At no time did the government actors disclose the risks associated with the massive radiation doses or obtain consent to irradiate the patients at those levels for those purposes-they instead told the patients that the radiation was treatment for their cancer. Id. at 803-04. Summarizing the caselaw just mentioned, the Cincinnati Radiation court easily concluded that "[t]he right to be free of state-sponsored invasion of a person's bodily integrity is protected by the Fourteenth Amendment guarantee of due process." Id. at 810-11. The involuntary and misleading nature of the intrusions was key. The patients could not "be said to exercise that degree of free will that is essential to the notion of voluntariness" because:
[t]he choice Plaintiffs would have been forced to make was one of life or death. If the Constitution protects personal autonomy in making certain types of important decisions, the decision whether to participate in the Human Radiation Experiments was one that each individual Plaintiff was entitled to make freely and with full knowledge of the purpose and attendant circumstances involved. Without actually seizing the Plaintiffs and forcing them to submit to these experiments, the ... agents of the state[ ] accomplished the same feat through canard and deception[.]
Id. at 812 (internal quotation marks and citations omitted). Also key was the risk of harm-the plaintiffs received "total and partial body radiation, which caused burns, vomiting, diarrhea and bone marrow failure, and resulted in death or severe shortening of life." Id. at 814.
We find the Cincinnati Radiation matter especially analogous. In both instances, individuals engaged in voluntary actions that they believed would sustain life, and instead received substances detrimental to their health. In both instances, government officials engaged in conduct designed to deceive the scope of the bodily invasion. And in both instances, grievous harm occurred. Based on the facts and principles set forth in the above cases, we therefore agree with the district court that "a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit."
Finally, we note what plaintiffs' claim does not entail. There is, of course, " 'no fundamental right to water service.' " In re City of Detroit , 841 F.3d 684, 700 (6th Cir. 2016) (quoting Golden v. City of Columbus , 404 F.3d 950, 960 (6th Cir. 2005) ). Moreover, the Constitution *922 does not guarantee a right to live in a contaminant-free, healthy environment. See, e.g ., Lake v. City of Southgate , 2017 WL 767879, at *4 (E.D. Mich. Feb. 28, 2017) (collecting cases). To this end, several defendants and the dissent cite a California state case involving residents complaining about a city fluoridating its drinking water supply. See Coshow v. City of Escondido , 132 Cal. App. 4th 687, 709, 34 Cal.Rptr.3d 19 (2005). However, Coshow is particularly inapposite because it shows the push-and-pulls of competing policy decisions that generally fall outside the scope of a violation of the right to bodily integrity-there, the government publicly introduced fluoride into the water system, a chemical frequently added to public water systems to prevent tooth decay. Here, defendants make no contention that causing lead to enter Flint's drinking water was for the public good or that they provided notice to Flint residents about the lead-laced water. Therefore, " Coshow did not address whether substantive due-process protections might be implicated in the case of intentional introduction of known contaminants by governmental officials, and its reasoning is inapplicable here." Mays , 916 N.W.2d at 262 n.16.
B.
Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant. See Am. Express Travel Related Servs. Co. v. Kentucky , 641 F.3d 685, 688 (6th Cir. 2011) ("[A] plaintiff must demonstrate a deprivation of a constitutionally protected liberty or property interest in order to establish a due process violation based on discretionary conduct of government officials[.]"). We use the "shocks the conscience" rubric to evaluate intrusions into a person's right to bodily integrity. Lillard v. Shelby Cty. Bd. of Educ. , 76 F.3d 716, 725 (6th Cir. 1996). Thus, a "plaintiff must show as a predicate the deprivation of a liberty or property interest" and conscience-shocking conduct. See EJS Props. , 698 F.3d at 861 ; Claybrook v. Birchwell , 199 F.3d 350, 359 (6th Cir. 2000) (holding that conscience-shocking behavior must be taken "towards the plaintiff's federally protected rights"); see also Vargas v. City of Phila. , 783 F.3d 962, 973 (3d Cir. 2015) ("To sustain a substantive due process claim, a plaintiff must show that the particular interest in question is protected by the Fourteenth Amendment and that the government's deprivation of that interest 'shocks the conscience.' "); United States v. Sanders , 452 F.3d 572, 577 n.4 (6th Cir. 2006) (similar); Martinez v. Cui , 608 F.3d 54, 64 (1st Cir. 2010) (similar).[5]
*923 "[T]he measure of what is conscience shocking is no calibrated yard stick," nor is it "subject to mechanical application." Lewis , 523 U.S. at 847, 850, 118 S.Ct. 1708. Several "tropes" help explain its meaning, Range , 763 F.3d at 589, with the focus again being on "executive abuse of power." Lewis , 523 U.S. at 846, 118 S.Ct. 1708. Rochin is the "benchmark." Id. at 846-47, 118 S.Ct. 1708. Due-process-violative conduct (there, forced stomach pumping to obtain evidence) "shocks the conscience," infringes upon the "decencies of civilized conduct," is "so brutal and so offensive to human dignity," and interferes with rights "implicit in the concept of ordered liberty." Rochin , 342 U.S. at 169, 172-74, 72 S.Ct. 205 (citation omitted); see also Lewis , 523 U.S. at 846-47, 118 S.Ct. 1708 (collecting authorities). "These are subjective standards, to be sure, but they make clear that the 'shocks the conscience' standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation." Range , 763 F.3d at 590. Stated differently, the shocks-the-conscience test is the way in which courts prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees.
To aid this inquiry, we are to place the alleged heinous conduct on a spectrum, "[t]he bookends [of which] present the easier cases." Id. On the one end is conduct that "is categorically beneath the threshold of constitutional due process," mere negligence. Lewis , 523 U.S. at 849, 118 S.Ct. 1708. Conduct that is "intended to injure in some way unjustifiable by any government interest" represents the other end, for this behavior "would most probably support a substantive due process claim." Id. We deal here not with these extremes, but rather in the middle, what the Court has deemed "something more than negligence but less than intentional conduct, such as recklessness or gross negligence." Id. (internal quotation marks omitted).
This "middle state[ ] of culpability 'may or may not be shocking depending on the context,' " Range , 763 F.3d at 590 (quoting Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ. , 542 F.3d 529, 535 (6th Cir. 2008) ), for what may "constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial," Lewis , 523 U.S. at 850, 118 S.Ct. 1708 (quoting Betts v. Brady , 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942) ). "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Id.
Lewis delineates this dichotomy. The issue there was "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." Id. at 836, 118 S.Ct. 1708. The Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment ...." Id. at 854, 118 S.Ct. 1708. In so holding, the Court highlighted how the time to deliberate in one circumstance may dictate liability in one situation but not another because "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical[.]" Id. at 851, 118 S.Ct. 1708. Take a classic deliberate indifference situation-when, for example, a prison official has "time to make unhurried *924 judgments, [with] the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." Id. at 853, 118 S.Ct. 1708. It is in these kinds of situations where we would expect plaintiffs asserting substantive due process claims based on deliberate indifference to be most successful. In rapidly evolving situations like prison riots, high-speed chases, and other tense, split-second-reaction-demanding matters, we apply "a much higher standard." Id. at 852-54, 118 S.Ct. 1708. We look instead to whether the state actor applies force "maliciously and sadistically for the very purpose of causing harm"-in other words, whether he acted with an intent to harm. Id. at 853, 118 S.Ct. 1708.
"The critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." Ewolski v. City of Brunswick , 287 F.3d 492, 510 (6th Cir. 2002) (internal quotation marks and brackets omitted). This "time to deliberate consideration," however, does not "transform any reckless action from a tort to conscience-shocking behavior simply because the government actor had time to appreciate any risk of harm. Time is instead one element in determining whether the actor's culpability 'inches close enough to harmful purpose to spark the shock that implicates' substantive due process." Range , 763 F.3d at 590 (quoting Lewis , 523 U.S. at 853, 118 S.Ct. 1708 ) (brackets omitted). Our focus instead is upon the entirety of the situation-"the type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm are all necessary factors in determining whether an official was deliberately indifferent." Id. at 591.
After Lewis , "the key variable is whether actual deliberation is practical, not whether the claimant was in state custody." Ewolski , 287 F.3d at 510 n.5. This is because "[c]ustodial settings ... are not the only situations in which officials may have a reasonable opportunity to deliberate." Id. But more importantly, even in non-custodial situations, we have stressed that deliberate indifference claims require "something more":
[A] something that we have variously described as callous disregard for the risk of injury, or action in an arbitrary manner that shocks the conscience or that indicates an intent to injure. That additional element-be it termed callous disregard or intent to injure-ensures that only the most egregious official conduct can be said to be arbitrary in the constitutional sense.
Schroder v. City of Fort Thomas , 412 F.3d 724, 730 (6th Cir. 2005) (internal citations, quotation marks, and brackets omitted).
We have identified a multitude of considerations when evaluating an official's alleged arbitrariness in the constitutional sense, including the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act. Hunt , 542 F.3d at 536. These factors help elucidate Lewis 's broader point that simply making bad choices does not rise to the level of deliberate indifference. Rather, "[f]or us to find deliberate indifference, ... we must find not only that the governmental actor chose to act (or failed to act) despite a subjective awareness of substantial risk of serious injury, but we also must make some assessment that he did not act in furtherance of a countervailing governmental purpose that justified taking that risk." Id. at 541 ; see also Schroder , 412 F.3d at 729 ("Many, if not most, governmental policy choices come with risks attached to both of the competing options, and yet 'it is not a tort for *925 government to govern' by picking one option over another." (citation omitted) ). "Essentially, the more voluntary the plaintiff-government relationship, or the less time the state actor has to deliberate, or the greater the extent to which the state actor is pursuing a legitimate end, the less arbitrary we should deem a bodily injury or death caused by the state actor." Durham v. Estate of Losleben , 744 F. App'x 268, 271 (6th Cir. 2018). We agree with the district court that these considerations weigh in favor of finding that the generally alleged conduct was so egregious that it can be said to be "arbitrary in the constitutional sense."[6]
Extensive time to deliberate. There is no doubt that the lead-contamination inflicted upon the people of Flint was a predictable harm striking at the core of plaintiffs' bodily integrity, and this known risk cannot be excused on the basis of split-second decision making. All of the alleged decisions by defendants leading up to and during the crisis took place over a series of days, weeks, months, and years, and did not arise out of time-is-of-the-essence necessity. Their "unhurried judgments" were replete with opportunities for "repeated reflection, largely uncomplicated by the pulls of competing obligations," and thus militate in plaintiffs' favor. Lewis , 523 at 853 ; see also Ewolski , 287 F.3d at 511-12. In the Court's words, because "[w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." Lewis , 523 U.S. at 853, 118 S.Ct. 1708.
Involuntary relationship. In addition to the time to deliberate, the relationship between the City of Flint and its residents matters. At the outset, we acknowledge we deal here not with the typical line of voluntary/involuntary relationships that normally occur in our caselaw. Instead, two factors weigh toward an involuntary relationship. First, Flint's transmission of drinking water to its residents is mandatory on both ends-Flint's Charter and Code of Ordinances mandate that the city supply water to its residents, see, e.g. , Flint City Charter § 4-203(A), Flint Code of Ord. § 46-7, and as the City expressly argued below, "residents are legally required to take and pay for the water, unless they use an approved spring or well." See Flint Code of Ord. §§ 46-50(b), 46-51, 46-52. Second, various defendants' assurances of the water's potability hid the risks, turning residents' voluntary consumption *926 of a substance vital to subsistence into an involuntary and unknowing act of self-contamination. As the district court aptly reasoned, "[m]isleading Flint's residents as to the water's safety-so that they would continue to drink the water and Flint could continue to draw water from the Flint River-is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional." (Citations omitted).[7]
No legitimate government purpose. The decision to temporarily switch Flint's water source was an economic one and there is no doubt that reducing cost is a legitimate government purpose. See, e.g. , Garrett v. Lyng , 877 F.2d 472, 476 (6th Cir. 1989). When a government acts "for the benefit of the public," normally its deliberate choice does not shock the conscience. See Hunt , 542 F.3d at 542. There is a caveat to this general rule-acting merely upon a government interest does not remove an actor's decision from the realm of unconstitutional arbitrariness. Id. at 543 ("[W]e have held open the possibility that in extreme cases the governmental actor's choice to endanger a plaintiff in the service of a countervailing duty would be deemed arbitrary[.]"). Here, jealously guarding the public's purse cannot, under any circumstances, justify the yearlong contamination of an entire community. In the words of the Michigan Court of Appeals, "we can conceive of no legitimate governmental objective for this violation of plaintiffs' bodily integrity." Mays , 916 N.W.2d at 262. (Some defendants contend their actions were motivated by other legitimate government purposes, and we address their positions below.)
There is no allegation defendants intended to harm Flint residents. Accordingly, the question is whether defendants acted with "[d]eliberate indifference in the constitutional sense," Range , 763 F.3d at 591, which we have "equated with subjective recklessness," Ewolski , 287 F.3d at 513 (citing Farmer v. Brennan , 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ). This is a particularly high hurdle, for plaintiffs must show the government officials "knew of facts from which they could infer a 'substantial risk of serious harm,' that they did infer it, and that they acted with indifference 'toward the individual's rights.' " Range , 763 F.3d at 591 (citation omitted). The deliberate-indifference standard requires an assessment of each defendant's alleged actions individually. See Bishop v. Hackel , 636 F.3d 757, 767 (6th Cir. 2011). Our focus is on each individual defendant's conduct, their "subjective awareness of substantial risk of serious injury," and whether their actions were made "in furtherance of a countervailing governmental purpose that justified taking that risk." Hunt , 542 F.3d at 541.
C.
Flint defendants (Earley, Ambrose, and Croft ). We begin with one of the two sets of defendants who were instrumental in creating the crisis-defendants Croft, Emergency Manager Earley, and Emergency Manager Ambrose. These individuals were among the chief architects of Flint's decision to switch water sources and then use a plant they knew was not ready to safely process the water, especially in light of the Flint River's known environmental issues and the problems associated with lead exposure. Earley, *927 for example, "forced the transition through" despite knowing how important it was that "the treatment plant be ready to treat Flint River water" and that "[t]he treatment plant was not ready." Similarly, Croft permitted the water's flow despite knowing "that the City's water treatment plant was unprepared to adequately provide safe drinking water to Flint's residents." The Flint defendants also made numerous statements to the public proclaiming that the water was safe to drink. Defendant Ambrose's decisions to twice turn down opportunities to reconnect to the DWSD after he knew of the significant problems with the water were especially egregious. These and other asserted actions plausibly allege deliberate indifference and "plain[ ] incompeten[ce]" not warranting qualified immunity. al-Kidd , 563 U.S. at 743, 131 S.Ct. 2074 (citation omitted). To the extent these defendants claim "mistakes in judgment" because they reasonably relied upon the opinions of Michigan Department of Environmental Quality (MDEQ) employees and professional engineering firms, see Pearson , 555 U.S. at 231, 129 S.Ct. 808, those are facts to be fleshed out during discovery and are not appropriate to resolve at the motion-to-dismiss posture. See, e.g. , Wesley , 779 F.3d at 433-34.
The dissent concludes that Ambrose and Earley were merely "rel[ying] on expert advice" and therefore their actions could not demonstrate a callous disregard for plaintiffs. However, this conclusion ignores Wesley 's guidance not to resolve such issues at the motion-to-dismiss stage. It also ignores our obligation to accept plaintiffs' allegations as true and draw reasonable inferences from those allegations. One can place a benign construction on the factual allegations and draw inferences so that the facts amount to a negligent mismanagement of priorities and risks; but the allegations also support a reasonable inference that Earley prioritized a drive to cut costs with deliberate and reckless indifference to the likely results, and Ambrose refused to reconnect to Detroit water despite knowing the substantial risk to Flint residents' health.
For now, we conclude that plaintiffs' complaint plausibly alleges a constitutional violation as to these defendants.
D.
MDEQ Defendants (Busch, Shekter-Smith, Prysby, Wurfel, and Wyant) . The MDEQ defendants were the other set of individuals front and center during the crisis. The allegations against defendants Busch, Shekter-Smith, Prysby, and Wurfel are numerous and substantial. These MDEQ defendants played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications. Furthermore, when faced with the consequences of their actions, they falsely assured the public that the water was safe and attempted to refute assertions to the contrary. A few poignant examples further illustrate their culpability:
• Less than two weeks before the switch to Flint water, the Flint water treatment plant's water quality supervisor wrote to Prysby and Busch that he had inadequate staff and resources to properly monitor the water. As a result, he informed Prysby and Busch, "I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction." Busch and Prysby did not act on this warning. Instead, a few days later, Busch drafted a talking point for a Flint community meeting that highlighted that MDEQ was *928 "satisfied with the City's ability to treat water from the Flint River."
• After General Motors very publicly stopped using Flint River water at its engine plant for fear of corrosion, Prysby made sure the department's approach was to spin this symptom as not related to public health instead of investigating the underlying problem. He "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."
• On February 27, 2015, Busch lied when he told "the EPA on behalf of MDEQ that the Flint Water Treatment Plant had an optimized corrosion control program." However, Busch knew "[b]y no later than April 2015, but likely much earlier ... that no corrosion control was being used in Flint following the switch to the Flint River as the water source." (Emphasis added).
• In the midst of the crisis and with full knowledge that Flint's water distribution system was corroded and presented significant health issues, Shekter-Smith callously excused Flint's lack of drinking water compliance as "circumstances happen." And after the EPA pressed MDEQ officials for MDEQ's failure to optimize corrosion controls in July 2015, she requested the EPA nonetheless cover her department's decision by "indicat[ing] in writing ... [its] concurrence that the city is in compliance with the lead and copper rule ...." Doing so, she wrote, "would help distinguish between [MDEQ's] goals to address important public health issues separately from the compliance requirements of the actual rule which we believe have been and continue to be met in the city of Flint." In other words, "technical compliance" trumped addressing an urgent and catastrophic public health disaster.
• On numerous occasions, defendant Wurfel, the public face of the crisis, announced the water was safe to drink, and demeaned, belittled, and aggressively dampened attempts by the scientific community to challenge the government's assertions that Flint did not have a problem with its drinking water. And he suggested that concern regarding the water was at best a short-term problem-that by the time the City had completed its lead-testing, the City would already be drawing from a different water source altogether.
As with the Flint defendants, these MDEQ defendants created the Flint Water environmental disaster and then intentionally attempted to cover-up their grievous decision. Their actions shock our conscience. It is alleged that these defendants acted with deliberate indifference to the plaintiffs' constitutional right to bodily integrity and at a minimum were plainly incompetent.
To the extent these defendants made "honest mistakes in judgment"-in law or fact-in interpreting and applying the Lead and Copper Rule, see, e.g. , Pearson , 555 U.S. at 231, 129 S.Ct. 808, that defense is again best reserved for after discovery. See, e.g. , Wesley , 779 F.3d at 433-34. This Rule generally requires public water systems to monitor lead and copper levels and to treat certain elevated levels in accordance with the regulation. 40 C.F.R. § 141.80 et. seq . More specifically, it requires a "large system," like Flint, to optimize corrosion control treatment before distribution of water to the public. § 141.81(a)(1). However, MDEQ employees did not follow this dictate; instead, *929 under a "flawed interpretation" of the Rule, they drew up a yearlong sampling program post-switch (broken up into two, six-month monitoring periods) to determine whether corrosion controls were required. In their view, this after-the-fact-wait-and-see approach to corrosion controls allegedly fell within minimum compliance levels of the Rule. Plaintiffs' view is bleaker. They assert MDEQ viewed Flint residents as "guinea pigs" for a year to test lead-compliance theories that were unsupported and unauthorized by the EPA just to pass time until water began flowing from a new water authority. To be sure, plaintiffs' view must be based on reasonable inferences from factual allegations. The district court correctly found that it is.
By the same token, we reject Wurfel's reliance upon two Second Circuit cases involving statements by public officials about the air-quality in lower Manhattan in the days following the September 11 terrorist attacks, see Lombardi v. Whitman , 485 F.3d 73 (2d Cir. 2007) and Benzman v. Whitman , 523 F.3d 119 (2d Cir. 2008), chiefly for the reason that those matters involved the balancing of competing governmental interests-restoring public services and protecting public health-during a time-sensitive environmental emergency. We have no such similar facts here on the face of plaintiffs' complaint.
The dissent again asks us to view plaintiffs' allegations in a light favorable to defendants, arguing that Shekter-Smith, Busch, and Prysby simply "misinterpreted the [EPA's] Lead and Copper Rule" and provided "misguided advice rooted in mistaken interpretations of the law." But plaintiffs' allegations, which we must accept, are that Busch, Shekter-Smith, and Prysby authorized use of Flint River water with knowledge of its contaminants and then deceived others to hide the fact of contamination. Moreover, it is improper to conclude at this stage that Shekter-Smith, Busch, and Prysby merely misinterpreted the Lead and Copper Rule because plaintiffs allege that the EPA informed them that they were not complying with EPA requirements, providing them with a memorandum that "identified the problem, the cause of that problem, and the specific reason the state missed it." In response, "Defendants ignored and dismissed" the memorandum. Although the dissent claims that plaintiffs' factual allegations do not support that Wurfel's statements were knowing lies, that is a reasonable inference from plaintiffs' factual allegations.
We cannot say the same with respect to defendant Director Wyant based on the allegations in the complaint. At most, plaintiffs claim Wyant was aware of some of the issues arising with the water supply post-switch and admitted his department's "colossal failure" after the City reconnected to DWSD. Plaintiffs do not plausibly allege Wyant personally made decisions regarding the water-source switch, nor do they allege he personally engaged in any other conduct that we find conscience-shocking. In short, while the conduct of individuals within his department was constitutionally abhorrent, we may only hold Wyant accountable for his own conduct, not the misconduct of his subordinates. See Ashcroft v. Iqbal , 556 U.S. 662, 676-77, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). For this reason, the district court erred in denying defendant Wyant's motion to dismiss.
E.
MDHHS Executives (Lyon and Wells) . In the complaint before us, plaintiffs' allegations against Michigan Department of Health and Human Services (MDHHS) Director Lyon and Chief Medical Executive Wells are minimal. The complaint sets forth no facts connecting Lyon *930 and Wells to the switch to the Flint River or the decision not to treat the water, and there is no allegation that they took any action causing plaintiffs to consume the lead-contaminated water. Instead, plaintiffs claim generally that Lyon and Wells failed to "protect and notify the public" of the problems with Flint's water shortly before Flint switched back to DWSD. However, the Due Process Clause is a limitation only on government action. See DeShaney , 489 U.S. at 195, 109 S.Ct. 998.
We are thus left with allegations of at most questionable actions by Lyon and Wells. The sole allegation against Lyon is that he attempted to "discredit" a study by Dr. Mona Hanna-Attisha, a pediatrician at Hurley Medical Center in Flint, showing significant increases of blood lead levels in children post-water-source switch.[8] Paragraph 289 of plaintiffs' complaint sets forth plaintiffs' entire case against Lyon:
MDHHS Director Nick Lyon continues trying to discredit Dr. Hanna-Attisha's study despite his own department's knowledge that it shows a real problem. In an e-mail, he stated: "I need an analysis of the Virginia Tech/Hurley data and their conclusions. I would like to make a strong statement with a demonstration of proof that the lead blood levels seen are not out of the ordinary and are attributable to seasonal fluctuations. Geralyn is working on this for me but she needs someone in public health who can work directly with her on immediate concerns/questions."
And the two main factual allegations against Wells are equally sparse:
• On September 29, 2015, Wells received an email from an MDHHS employee asking, "Is it possible to get the same type of data for just children under the age of six? So basically, the city of Flint kids ages six and under with the same type of approach as the attached chart you gave us last week?" Another employee responded that "[i]t's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases." Dr. Wells replied "Agree." Plaintiffs claim this "show[ed] MDHHS continuing efforts to mislead the public, protect itself, and discredit Dr. Hanna-Attisha."
• In response to an email from Dr. Hanna-Attisha showing the tripling of blood lead levels, Wells "responded that the state was working to replicate Hanna-Attisha's analysis, and inquired about Dr. Hanna-Attisha's plans to take the information public." According to plaintiffs, this shows that "[w]hile discouraging her department to look further into Dr. Hanna-Attisha's findings and misleading Dr. Hanna-Attisha, Defendant Wells remained focused on a single task; saving face at the expense of Flint's residents."
At most, plaintiffs have alleged Lyon and Wells were unjustifiably skeptical of Dr. Hanna-Attisha's study and were hoping to assemble evidence to disprove it. This falls well-short of conscience-shocking conduct *931 and therefore the district court erred in denying their motions to dismiss.
F.
MDHHS Employees (Peeler and Scott). That leaves us with two MDHHS employees, Nancy Peeler and Robert Scott, who jointly worked on projects within MDHHS designed to eliminate lead exposure. As with Lyon and Wells, the allegations against Peeler and Scott relate not to the switch of water sources, but to how they processed-or rather did not process-data relating to lead exposure more than a year later.
In general, plaintiffs allege Peeler and Scott "participated in, directed, and/or oversaw the department's efforts to hide information to save face, and actively sought to obstruct and discredit the efforts of outside researchers. Even when [their] own department had data that verified outside evidence of a lead contamination problem, [they] continued trying to generate evidence to the contrary." Scott "also served a key role in withholding and/or delaying disclosure of data that outside researchers needed to protect the people of Flint." In support of these general allegations, plaintiffs point to the following:
• Beginning in July 2015, Peeler learned there was "an uptick in children with elevated blood lead levels in Flint in July, August, and September 2014," but attributed it to "seasonal variation" instead of the water-source switch.
• On September 11, 2015, Robert Scott e-mailed a copy of a grant proposal by a Virginia Tech professor, Marc Edwards, that "described a 'perfect storm' of 'out of control' corrosion of city water pipes leading to 'severe chemical/biological health risks for Flint residents' " to Peeler and others. Scott stated, "When you have a few minutes, you might want to take a look at it. Sounds like there might be more to this than what we learned previously. Yikes!"
• Following Dr. Hanna-Attisha's study, Scott "tried to recreate [her] numbers," saw "a difference"-"but not as much difference" as found by Dr. Hanna-Attisha-in children's lead-levels pre-and post-switch, but told Peeler that he was "sure this one is not for the public."
• Scott, Peeler, and another MDHHS colleague corresponded about a Detroit Free Press story on Dr. Hanna-Attisha's study. Scott wrote, "The best I could say is something like this: 'While the trend for Michigan as a whole has shown a steady decrease in lead poisoning year by year, smaller areas such as the city of Flint have their bumps from year to year while still trending downward overall.' " Peeler chimed in that her "secret hope is that we can work in the fact that this pattern is similar to the recent past." In plaintiffs' view, this correspondence shows Peeler and Scott "intentionally withheld information that they had a duty to disclose to the public, and actively sought to hide the lead poisoning epidemic that they had previously failed to discover."
• Scott drafted an apology email to Prof. Edwards explaining why he failed to respond to multiple requests for state data. His unsent email to Edwards explained that he "worked with you earlier this month to get data to you relatively quickly but did not manage to complete the process before I went on annual leave for several days. I neglected to inform you that I'd be away, and I apologize for not informing you.' " Scott did not send the email to Edwards after Peeler told him to "apologize less," "despite," in plaintiffs' words, "the *932 fact that Scott admitted to going on vacation and leaving an unimportant task unfinished as a public health crisis unfolded."
In total, plaintiffs' allegations against Scott and Peeler are: (1) after Dr. Hanna-Attisha released her study on September 24, 2015, Scott tried to "recreate" the study, found a smaller difference in children's lead levels than Dr. Hanna-Attisha's study, and concluded his results were "not for the public"; (2) Scott did not timely provide researchers with requested data; (3) Peeler and Scott knew that elevated lead levels could have been due to corrosion in the city water pipes; and (4) both sought to attribute it to regular fluctuations. In our view, these allegations do not rise to the level of "callous disregard"; plaintiffs do not factually link Scott's and Peeler's inaction to causing Flint residents to consume (or continue to consume) lead-tainted water. Nor do plaintiffs identify a source of law for the proposition that an individual violates the right to bodily integrity just because he failed to "blow the whistle." Plaintiffs have therefore not plausibly alleged Scott and Peeler engaged in conscience-shocking conduct.
In sum, the district court erred in finding that plaintiffs adequately alleged that defendants Wyant, Lyon, Wells, Peeler, and Scott violated plaintiffs' substantive due process right to bodily integrity, but correctly held plaintiffs plausibly alleged such a violation against defendants Earley, Ambrose, Croft, Busch, Shekter-Smith, Prysby, and Wurfel.
VI.
A right is "clearly established" when its "contours ... [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton , 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Notice to officials is paramount; "the salient question" in evaluating the clearly established prong is whether officials had "fair warning" that their conduct was unconstitutional. Hope v. Pelzer , 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). In making this determination, "we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." Baker v. City of Hamilton , 471 F.3d 601, 606 (6th Cir. 2006) (quotation omitted).
Plaintiffs must generally identify a case with a fact pattern similar enough to have given "fair and clear warning to officers" about what the law requires. White v. Pauly , --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam) (quotation omitted); see also Arrington-Bey v. City of Bedford Heights , 858 F.3d 988, 993 (6th Cir. 2017). But such a case need not "be on all fours in order to form the basis for the clearly established right." See Burgess v. Fischer , 735 F.3d 462, 474 (6th Cir. 2013). We do not require a prior, "precise situation," Sutton , 700 F.3d at 876, a finding that "the very action in question has previously been held unlawful," Comstock v. McCrary , 273 F.3d 693, 702 (6th Cir. 2001) (internal quotation marks omitted), or a "case directly on point." al-Kidd , 563 U.S. at 741, 131 S.Ct. 2074. Instead, the test is whether "existing precedent must have placed the ... constitutional question beyond debate." Id. This means there must either be "controlling authority or a robust consensus of cases of persuasive authority." Plumhoff v. Rickard , 572 U.S. 765, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (internal quotation marks omitted). Finally, "an action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs."
*933 Baynes v. Cleland , 799 F.3d 600, 612 (6th Cir. 2015) (citing Hope , 536 U.S. at 742-44, 122 S.Ct. 2508 ).
Given the unique circumstances of this case, defendants argue we should defer to the "breathing room" qualified immunity provides and hold that the invasion of plaintiffs' right to bodily integrity via life-threatening substances with no therapeutic benefit introduced into individuals without their consent was not clearly established before the officials engaged in their respective conduct. The dissent likewise suggests that "plaintiffs must be able to 'identify a case with a similar fact pattern' to this one 'that would have given 'fair and clear warning to officers' about what the law requires.' " (Quoting Arrington-Bey , 858 F.3d at 993 (quoting White , 137 S.Ct. at 552 ) ). But the Court has "mad[e] clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope , 536 U.S. at 741, 122 S.Ct. 2508 ; see also White , 137 S.Ct. at 552 (noting that "general statements of the law are not inherently incapable of giving fair and clear warning" where the unlawfulness is apparent (citation omitted) ). For the reasons that follow, we decline to erect the suggested "absolute barrier to recovering damages against an individual government actor." Bletz , 641 F.3d at 756 (citation omitted).
The lack of a comparable government-created public health disaster precedent does not grant defendants a qualified immunity shield. Rather, it showcases the grievousness of their alleged conduct: "The easiest cases don't even arise," United States v. Lanier , 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citation and internal quotation marks omitted); "there is no need that the very action in question [have] previously been held unlawful" because "[t]he unconstitutionality of outrageous conduct obviously will be unconstitutional," Safford Unified Sch. Dist. No. 1 v. Redding , 557 U.S. 364, 377, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) (internal quotation marks omitted); and "[s]ome personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion." Brannum v. Overton Cty. Sch. Bd. , 516 F.3d 489, 499 (6th Cir. 2008).
Knowing the Flint River water was unsafe for public use, distributing it without taking steps to counter its problems, and assuring the public in the meantime that it was safe "is conduct that would alert a reasonable person to the likelihood of personal liability." Scicluna v. Wells , 345 F.3d 441, 446 (6th Cir. 2003). As set forth above, taking affirmative steps to systematically contaminate a community through its public water supply with deliberate indifference is a government invasion of the highest magnitude. Any reasonable official should have known that doing so constitutes conscience-shocking conduct prohibited by the substantive due process clause.[9] These "actions violate the heartland of the constitutional guarantee" to the right of bodily integrity, Stemler v. City of Florence , 126 F.3d 856, 867 (6th Cir. 1997), and "t[he] obvious cruelty inherent" in defendants' conduct should have been enough to forewarn defendants. Hope , 536 U.S. at 745, 122 S.Ct. 2508.
Furthermore, the long line of Supreme Court cases discussed above- Harper , Cruzan , Rochin , Winston , to name a few-all *934 build on each other from one foundation: an individual's right to bodily integrity is sacred, founded upon informed consent, and may be invaded only upon a showing of a government interest. The Court could not have been clearer in Harper when it stated that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." 494 U.S. at 229, 110 S.Ct. 1028. Here we have an even more dramatic invasion, for at least in Harper the state forced medication-something needed to improve or sustain life-into its citizens; here, government officials caused Flint residents to consume a toxin with no known benefit, did so without telling them, and made affirmative representations that the water was safe to drink.
The same can be gleaned from Cruzan. If the common law right to informed consent is to mean anything, reasoned the Court, it must include "the right of a competent individual to refuse medical treatment." 497 U.S. at 277, 110 S.Ct. 2841. If an individual has a right to refuse to ingest medication, then surely she has a right to refuse to ingest a life necessity. Cruzan instructs as much, recognizing that the "logic" of its bodily integrity cases-i.e., the reasoning-encompasses an individual's liberty interest to refuse "food and water essential to life." Id. at 279, 110 S.Ct. 2841. And if an individual has a right to refuse the consumption of beneficial water, then certainly any reasonable official would understand that an individual has a right to refuse the consumption of water known to be lead-contaminated, especially when those individuals involved in tainting the water simultaneously vouched for its safety. Put differently, plaintiffs' bodily integrity claim implicates a clearly established right that "may be inferred from [the Supreme Court's] prior decisions." Id. at 278, 110 S.Ct. 2841. Before Cruzan , a factually identical case had not been decided by the Court. Nonetheless, the Supreme Court held that the right to bodily integrity claim there was compelled by the logic and reasonable inferences of its prior decisions. Id. at 270, 278-79, 110 S.Ct. 2841. The same is true here.
Several defendants take issue with the district court's definition of the right, contending it deals in generality instead of specificity. See, e.g. , al-Kidd , 563 U.S. at 742, 131 S.Ct. 2074 (admonishing courts "not to define clearly established law at a high level of generality"). Our focus, of course, is "whether the violative nature of particular conduct is clearly established ... in light of the specific context of the case." Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (internal quotation marks omitted). To be sure, sweeping statements about constitutional rights do not provide officials with the requisite notice. "For example," the Supreme Court has told us, "the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right." Anderson , 483 U.S. at 639, 107 S.Ct. 3034. But, the deficiencies of a too-general clearly established test have no bearing on the specifics of this case. Here, the right recognized by the district court-and one we adopt as directly flowing from the reasoning of the long line of bodily integrity and shocks-the-conscience cases-is neither a "general proposition" nor one "lurking in the broad 'history and purposes' " of the substantive due process clause. al-Kidd , 563 U.S. at 742, 131 S.Ct. 2074. "Any other result would allow Hope 's fear of 'rigid, overreliance on factual similarity' in analyzing the 'clearly established' prong of the qualified immunity standard to be realized."
*935 Baynes , 799 F.3d at 614 (quoting Hope , 536 U.S. at 742, 122 S.Ct. 2508 ).[10]
In providing a tainted life-necessity and falsely assuring the public about its potability, government officials "strip[ped] the very essence of personhood" from those who consumed the water. Doe , 103 F.3d at 507. They also caused parents to strip their children of their own personhood. If ever there was an egregious violation of the right to bodily integrity, this is the case; the "affront to human dignity in this case is compelling," United States v. Booker , 728 F.3d 535, 546 (6th Cir. 2013), and defendants' "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe ... [their conduct] is constitutionally permissible under the Due Process Clause." Doe , 103 F.3d at 507. We therefore agree with the district court that plaintiffs have properly pled a violation of the right to bodily integrity against Howard Croft, Darnell Earley, Gerald Ambrose, Liane Shekter-Smith, Stephen Busch, Michael Prysby, and Bradley Wurfel, and that the right was clearly established at the time of their conduct. Should discovery shed further light on the reasons behind their actions (as but one example, a governmental interest that trumps plaintiffs' right to bodily integrity), they are free to raise the qualified immunity defense again at the summary judgment stage. See, e.g. , Miller v. Maddox , 866 F.3d 386, 390 (6th Cir. 2017) ; see also Wesley , 779 F.3d at 433-34.[11]
VII.
The final issue is Flint's claim that the district court erred in denying it sovereign immunity. The Eleventh Amendment provides that "[t]he Judicial power of the *936 United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It bars suits against a state by its own citizens, and by citizens of another state. See, e.g. , Bd. of Trs. of Univ. of Ala. v. Garrett , 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." Id.
Flint, obviously, is not a state; it is a municipality incorporated under the laws of the State of Michigan. See People v. Pickett , 339 Mich. 294, 63 N.W.2d 681, 684 (1954). The Supreme Court could not be clearer in demarcating between states and their political subdivisions for sovereign immunity purposes: "The bar of the Eleventh Amendment to suit in federal court extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle , 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (internal citations omitted); see also Jinks v. Richland Cty. , 538 U.S. 456, 466, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003) ("[M]unicipalities, unlike States, do not enjoy a constitutionally protected immunity from suit."). We have even noted this contrast in one of our previous Flint Water Crisis cases, stating in dicta that the Eleventh Amendment does not apply to "the defendants associated with the City of Flint." Boler , 865 F.3d at 410.
Flint readily concedes municipalities do not enjoy sovereign immunity. That would normally end our analysis, but this is not a typical case. At the time of the crisis, Flint was so financially distressed that the State of Michigan had taken over its day-to-day local government operations by way of a statutory mechanism enacted to deal with municipal insolvency-gubernatorial-appointed individuals who "act for and in the place and stead of the governing body and the office of chief administrative officer of the local government." Mich. Comp. Laws § 141.1549(2) ; see generally Phillips v. Snyder , 836 F.3d 707, 711-12 (6th Cir. 2016) (summarizing Michigan's Local Financial Stability and Choice Act (or Public Act 436) ). Flint contends it became an arm of the state because of the State of Michigan's takeover. We thus find it more appropriate to resolve whether this extraordinary factor dictates a different outcome. See Monell v. Dep't of Soc. Servs. of City of New York , 436 U.S. 658, 690 n.54, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (suggesting that under some circumstances, local governmental units could be "considered part of the State for Eleventh Amendment purposes"). On de novo review, see Babcock v. Michigan , 812 F.3d 531, 533 (6th Cir. 2016), we agree with the district court that the City of Flint is not entitled to Eleventh Amendment immunity.[12]
A.
"The entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, i.e. , that it is an arm of the state."
*937 Lowe v. Hamilton Cty. Dep't of Job & Family Servs. , 610 F.3d 321, 324 (6th Cir. 2010) (brackets and citation omitted). We have identified four factors relevant to "whether an entity is an 'arm of the State' on the one hand or a 'political subdivision' on the other": "(1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes, and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government." Ernst v. Rising , 427 F.3d 351, 359 (6th Cir. 2005) (en banc) (internal citations omitted).
We have characterized the first factor-the state's potential liability for a judgment against the entity-as "the foremost," id. , the "most salient," Town of Smyrna v. Mun. Gas Auth. of Ga. , 723 F.3d 640, 651 (6th Cir. 2013), and one creating "a strong presumption" on the issue. Kreipke v. Wayne State Univ. , 807 F.3d 768, 777 (6th Cir. 2015). Although this "state-treasury inquiry will generally be the most important factor, ... it is not the sole criterion." Ernst , 427 F.3d at 364 (internal quotation marks omitted). This is so because sovereign immunity protects not only a state's purse but also its dignity-"it ... serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." Seminole Tribe v. Florida , 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (citation omitted). Accordingly, "the last three factors may demonstrate that an entity is an arm of the state entitled to sovereign immunity despite the fact that political subdivisions and not the State are potentially liable for judgments against the entity." Pucci v. Nineteenth Dist. Court , 628 F.3d 752, 762 (6th Cir. 2010). To do so, however, they must "far outweigh" the first factor. Id. at 761. Applying this test, we conclude the City of Flint has not met its burden to show that it was an "arm of the state" protected by the Eleventh Amendment.[13]
1.
Michigan's potential liability (or rather, lack thereof) weighs heavily against Flint. Michigan law provides that local property tax rolls account for judgments against cities or its officers, see Mich. Comp. Laws § 600.6093(1), while the state treasury pays judgments against "arms of the state." See Mich. Comp. Laws §§ 600.6458(2), 600.6096(1). Public Act 436 does not change this; in fact, it reinforces this dynamic, providing that any claims, demands, or lawsuits "arising from an action taken during the services of [an] emergency manager" are to "be paid out of the funds of the local government that is or was subject to the receivership administered by that emergency manager." Mich. Comp. Laws § 141.1560(5). Most critically, *938 Public Act 436 "does not impose any liability or responsibility in law or equity upon th[e] state, any department, agency, or other entity of th[e] state, or any officer or employee of th[e] state, or any member of a receivership transition advisory board, for any action taken by any local government under this act, for any violation of the provisions of this act by any local government, or for any failure to comply with the provisions of this act by any local government." Mich. Comp. Laws § 141.1572. Michigan's lack of potential liability here creates a "strong presumption" against an Eleventh Amendment finding. See Kreipke , 807 F.3d at 777.
2.
As to the second factor-state law treatment of, and state control over, the entity-we start with a foundational aspect of Michigan law undisputed by the parties: Municipalities enjoy significant autonomy over local governmental functions. "Michigan is strongly committed to the concept of home rule, and constitutional and statutory provisions which grant power to municipalities are to be liberally construed." Bivens v. Grand Rapids , 443 Mich. 391, 505 N.W.2d 239, 243 (1993). Michigan's Constitution grants cities the "power to adopt resolutions and ordinances relating to its municipal concerns, property and government." Mich. Const. Art. 7, § 22 (1963). The Michigan Supreme Court has also held that home rule cities like Flint "enjoy not only those powers specifically granted, but they may also exercise all powers not expressly denied." AFSCME v. City of Detroit , 468 Mich. 388, 662 N.W.2d 695, 707 (2003) (citation and internal quotation marks omitted). Although state statutes and Michigan's Constitution may limit these broad powers, Michigan's clear preference is that municipalities have "great[ ] latitude to conduct their business." Associated Builders & Contractors v. City of Lansing , 499 Mich. 177, 880 N.W.2d 765, 769 (2016). Flint asks us to find an exception to these general principles because it was engaged in providing water services to its citizens and did so while under the control of emergency managers. We decline to do so.
First, citing Curry v. City of Highland Park , 242 Mich. 614, 219 N.W. 745 (1928), Flint claims that when a municipality acts in the interest of public health, like providing water services, it "acts as the arm of the state" under Michigan law. Id. at 748. We disagree. For one, Curry noted that "the management of water works" is a "matter[ ] of purely local concern ... as distinguished from the state at large." Id. (citation omitted). But more importantly and as recently illustrated by another Flint Water Crisis case, that is not what Michigan law provides. See Boler v. Governor , 324 Mich.App. 614, --- N.W.2d ---- (2018) (per curiam).[14] The import of Michigan's Constitution and its Home Rule City Act, Mich. Comp. Laws § 117.1, et seq. , is that "if a municipality is supplying a utility, or specifically waterworks, to its citizens and the citizens are paying for the same, the municipality is operating the waterworks as a business and it is doing so as a businessman or corporation, not as a concern of the state government or arm of *939 the state. It is, after all, serving only a limited number of people within its boundaries, not the state as a whole." Id. at ----, --- N.W.2d ----. Michigan's Home Rule City Act expressly empowers a municipality to "provide for the installation and connection of sewers and waterworks in its charter." Id. (citing Mich. Comp. Laws § 117.4b ); see also Mich. Comp. Laws §§ 117.4c(1), 117.4f. But if, for example, a municipality supplies water for another purpose-"protecting its citizens from fire or natural disaster or anything else that has the potential to have state-wide impact, and it is not profiting from the provision of that water"-then and only then could a municipality's waterworks "perhaps" serve the state's citizenry at large and thus be deemed an arm of the state. Boler , 324 Mich.App. at ----, --- N.W.2d ----. And as the Michigan Court of Appeals determined, Flint's provision of water services clearly falls within its "proprietor" function and does not transform the city into an arm of the state. Id. ; see also Collins v. City of Flint , 2016 WL 8739164, at *4 (Mich. Ct. Cl. Aug. 25, 2016).
Second, we are equally unconvinced that Flint's emergency-management status should weigh in Flint's favor. At first blush, Flint's argument here has some facial appeal-generally speaking, Public Act 436 can be a one-way ticket to state receivership. The governor, in consultation with several bodies, determines whether a financial emergency exists, and then provides the entity at issue with four options (one of which is emergency management). See Phillips , 836 F.3d at 712. Flint claims these options are illusory because state officials still have significant oversight within each option, and were nonetheless unavailable to Flint because Public Act 436 kept in place Flint's prior-appointed emergency manager under a prior version of the emergency manager law. See id. at 711-12 ; see also Mich. Comp. Laws § 141.1549(10).
Once in receivership, the argument goes, Flint was essentially at the whim of its emergency managers. One need not look beyond Public Act 436's power-authorizing provision to appreciate its breadth:
Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government . The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager.
Mich. Comp. Laws § 141.1549(2) (emphasis added). In essence, an emergency manager acts "for and on behalf of the local government," and may take any "action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government." § 141.1552(dd)-(ee).
There is also a certain amount of control the state has over the emergency manager. Among other things, an emergency manager "is a creature of the Legislature with only the power and authority granted *940 by statute"; is appointed by the governor; serves at the governor's pleasure, and may be removed by the governor or by impeachment by the Legislature; receives financial compensation from the state treasury; is subjected "to various codes of conduct otherwise applicable only to public servants, public officers and state officers"; and is statutorily obligated to submit certain plans and reports to state officials. See Mays , 916 N.W.2d at 256 (citations omitted). On this basis, the Michigan Court of Appeals has held (again, in a Flint Water Crisis matter) that an emergency manager is a "state officer" for purposes of the Court of Claims Act and thus "[c]laims against an emergency manager acting in his or her official capacity therefore fall within the well-delineated subject-matter jurisdiction of the Court of Claims." Id. at 257.
The problem with Flint's argument is that Michigan courts have rejected the notion that a city's emergency management status transforms a city into a state entity. In the words of the Michigan Court of Appeals:
As indicated in the Local Financial Stability and Choice Act, "it is a valid public purpose for this state to take action and to assist a local government in a financial emergency so as to remedy the financial emergency." The primary purpose of the Act, then, was for the State of Michigan to assist local governments temporarily during a financial crisis. The emergency manager acts in the place of the chief administrative officer and governing body for and on behalf of the local government only. At all times, then, the City remained a municipality, albeit with a state employee temporarily overseeing the financial management of the municipality affairs. The City was at no time operating as "a means or agency through which a function of another entity i.e., the state is accomplished." No function or purpose of the state was accomplished in the emergency manager overseeing the City. The City was instead always operating as a means through which functions of its own entity were accomplished. The state simply engaged a state employee to temporarily assist the City in performing its functions and serving its local purposes for its citizens.
Boler v. Governor , 324 Mich.App. 614, --- N.W.2d ---- (alterations and citations omitted); see also Collins , 2016 WL 8739164, at *4-5. We agree with this well-reasoned analysis. Moreover, it is consistent with our recent decision in Phillips , where we noted Public Act 436 merely reflects states' abilities "to structure their political subdivisions in innovative ways," including by "allocat[ing] the powers of subsidiary bodies among elected and non-elected leaders and policymakers." 836 F.3d at 715. That is, Public Act "436 does not remove local elected officials; it simply vests the powers of the local government in an emergency manager." Id. at 718.
Given this, we conclude the second factor tilts against Flint.
3.
The appointment factor weighs in Flint's favor. Public Act 436 expressly provides that the governor appoints an emergency manager. Mich. Comp. Laws § 141.1549(1). The state attempts to temper this specific appointment language by pointing out that emergency management under Public Act 436 is one of last resort-that upon declaration of financial emergency, a municipality has several options in addition to emergency management, see § 141.1547, and may remove an emergency manager after 18 months (or petition the governor to remove the emergency manager earlier). § 1549(6)(c), (11). That may be so, but Ernst is specific here-we are to consider who appoints the entity at issue, *941 and there is no debating that although a municipality might have some ability to avoid emergency management or to remove an emergency manager, Michigan's governor appoints emergency managers.
4.
Whether the entity's functions fall within the traditional purview of state or local government weighs heavily against Flint. Under Public Act 436, an emergency manager takes the place of a local body; he, in other words, takes over the local government's functions. And as the State of Michigan rightly phrases it, "[t]he City of Flint's functions are 'within the traditional purview of local government' because the City of Flint is a local government."
Flint has no answer for this obvious point, and instead asks us to narrowly focus on the City's provision of waterworks. It underwhelmingly strings this argument together: Because Michigan's Safe Drinking Water Act provides the MDEQ with "power and control over public water supplies and suppliers of water" and criminalizes the failure to comply with MDEQ rules, see Mich. Comp. Laws §§ 325.1003, 325.1021, "the functioning of a waterworks falls within the purview of the State." But even were we to ignore the fact that Public Act 436's command to an emergency manager is to take over all of a municipality's functions and not just its utilities, the answer is still the same given our discussion above. Flint even admits as much, telling us "the day-to-day operations of a waterworks generally fall within the purview of local authorities." That MDEQ "exercises the state's police powers, in an oversight capacity, by regulating the water quality" does not dictate a contrary conclusion, for "MDEQ does not own, operate or maintain the water delivery systems, ... [n]or is it charged with providing water to the inhabitants of Michigan's cities." Collins , 2016 WL 8739164, at *4. Thus, we decline to effectively turn every local governmental body's provision of service into an arm of the state when that service is regulated by the state in some fashion. Cf. N. Ins. Co. of New York v. Chatham Cty. , 547 U.S. 189, 194, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006) (merely "exercis[ing] a slice of state power" does not transform a state's subdivision into an arm of the state (internal quotation marks omitted) ).
B.
In sum, Flint has not met its burden to show that when under emergency management, it was an "arm of the state" protected by the Eleventh Amendment. The foremost consideration-the state's potential liability for judgment-counsels against a finding of Eleventh Amendment immunity, and the remaining factors do not "far outweigh" this factor. Pucci , 628 F.3d at 761.
VIII.
For these reasons, we affirm the district court in part, and reverse in part.
CONCURRING IN PART AND DISSENTING IN PART

The Michigan Court of Appeals and Michigan Court of Claims construed the Due Process Clause of the Michigan Constitution and, following Michigan precedent, deemed it coextensive with its federal counterpart. See, e.g. , Mays , 916 N.W.2d at 261.

We have changed the docket to correct plaintiffs' misspelling of Shekter-Smith's name.

Some defendants contend actual and targeted physical force by a government actor is requisite for a bodily integrity invasion. But as set forth, the right to bodily integrity's anchor is control of one's own person by way of informed consent, and thus the method upon which the government enters the body is irrelevant. Boler , 865 F.3d at 408 n.4 ; see also Planned Parenthood of Se. Pennsylvania v. Casey , 505 U.S. 833, 857, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality op).

See, e.g. , Barrett v. United States , 798 F.2d 565 (2d Cir. 1986) ; Lojuk v. Quandt , 706 F.2d 1456 (7th Cir. 1983) ; Rogers v. Okin , 634 F.2d 650 (1st Cir. 1980), overruled on other grounds sub nom , Mills v. Rogers , 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982) ; Bounds v. Hanneman , 2014 WL 1303715 (D. Minn. Mar. 31, 2014) ; Heinrich v. Sweet , 62 F.Supp.2d 282 (D. Mass. 1999) ; Stadt v. Univ. of Rochester , 921 F.Supp. 1023 (W.D.N.Y. 1996) ; In re Cincinnati Radiation Litigation , 874 F.Supp. 796 (S.D. Ohio 1995) ; Davis v. Hubbard , 506 F.Supp. 915 (N.D. Ohio 1980).

In dicta, we stated in Range that "[o]ur case law on substantive due process is somewhat conflicted as to whether an underlying constitutionally-protected right must be established in order for a government action to violate one's rights by shocking the conscience," and then cited EJS Properties for the proposition that in non-zoning decision contexts "we have held that 'government action may certainly shock the conscience or violate substantive due process without a liberty or property interest at stake.' " 763 F.3d at 589 (quoting EJS Props. , 698 F.3d at 861-62 ). For that statement, EJS Properties , in dicta as well, cited two pre-Lewis cases, and more importantly, American Express -a case involving a constitutional challenge to a state law. 698 F.3d at 861-62. Range 's and EJS Properties ' dicta misconstrue American Express , which expressly held "a plaintiff must demonstrate a deprivation of a constitutionally protected liberty or property interest in order to establish a due process violation based on discretionary conduct of government officials," unless the matter involves a constitutional challenge to a state law. Am. Express , 641 F.3d at 688-89 (citation omitted). This is consistent with Lewis, 523 U.S. at 847 n.8, 118 S.Ct. 1708.

Several defendants suggest we should depart from this line of authorities and instead reject plaintiffs' claim on the basis of the Supreme Court's pre-Lewis decision in Collins , where the Supreme Court rejected a substantive due process claim that "the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace" and the city's deliberate indifference to employee safety shocked the conscience. 503 U.S. at 125-26, 112 S.Ct. 1061. True, the substantive due process clause "confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual," DeShaney , 489 U.S. at 195, 109 S.Ct. 998, nor does it set a floor for the public's right to be safe and secure, see Collins , 503 U.S. at 127, 112 S.Ct. 1061. But these general principles have no applicability here-this is not a workplace injury case, plaintiffs do not allege Flint was required to provide them with "certain minimal levels of safety and security," id. , and DeShaney itself makes clear in the same token that injuries caused by the state are of a different ilk. 489 U.S. at 195-96, 109 S.Ct. 998. Nor is there a contention that-unlike many public employees hired to perform inherently dangerous jobs who thus "assumed the risk," Hunt , 542 F.3d at 538 -Flint residents voluntarily consumed the water in the face of likely lead-exposure. For these reasons, our post-Collins , pre-Lewis caselaw relied upon by defendants is similarly distinguishable. See, e.g. , Lewellen , 34 F.3d 345 ; Upsher v. Grosse Pointe Pub. Sch. Sys. , 285 F.3d 448 (6th Cir. 2002).

See also Briscoe v. Potter , 355 F.Supp.2d 30, 45-47 (D.D.C. 2004) (holding that plaintiffs sufficiently alleged conscience-shocking conduct where defendants knew a post office distribution center was contaminated with anthrax, made affirmative misrepresentations about the facility's safety, and coerced plaintiffs into continuing to work at the facility).

They also allege Lyon "participated in, directed, and/or oversaw the department's efforts to hide information to save face, and to obstruct and discredit the efforts of outside researchers. He knew as early as 2014 of problems with lead and legionella contamination in Flint's water and instead of fulfilling his duty to protect and notify the public, he participated in hiding this information." (Plaintiffs make the same general allegation against Wells.) But this is precisely the type of "chimerical," "bare assertion[ ]" Iqbal requires we set aside. 556 U.S. at 681, 129 S.Ct. 1937.

See also Wright v. City of Phila ., 2015 WL 894237, at *13 (E.D. Penn. March 2, 2015) ("[I]t would have been clear to a reasonable [government] employee that causing the release of airborne asbestos in Plaintiffs' home and then failing to notify Plaintiffs or acting in any way to mitigate the harm caused by the release, was unlawful under the circumstances.").

Some defendants and the dissent direct us to dicta in a recent District of New Jersey case involving a bodily integrity claim arising out of the discovery of leaded water in the Newark, New Jersey's public-school buildings. See Branch v. Christie , 2018 WL 337751 (D.N.J. Jan. 8, 2018). We are not obligated to give this decision, let alone its dicta, any persuasive value. See Baker , 471 F.3d at 606. The opinion is bereft of any substantive analysis regarding the right to bodily integrity, and wholly omits discussion of the Supreme Court cases mentioned in detail here. It is also factually distinct in at least one major aspect-here, the government officials participated in the decision to taint Flint's water-supply in the first instance; there, the government officials failed to take action upon discovery of the leaded water.

We deny plaintiffs' pending motion to take judicial notice of pending but unproven criminal charges against some of the defendants and note that that the district court erred in doing so and using them to justify denying qualified immunity. First, although courts may consider judicially noticed facts when evaluating motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), see, e.g. , Buck v. Thomas M. Cooley Law Sch. , 597 F.3d 812, 816 (6th Cir. 2010), we have held that a "criminal indictment qualifies as a matter outside the pleading" therefore necessitating conversion to a Rule 56 motion. Rose v. Hartford Underwriters Ins. Co. , 203 F.3d 417, 420 (6th Cir. 2000) (brackets and internal quotation marks omitted). Second, it was error for the district court to consider the charges for qualified-immunity purposes without engaging in the proper analysis. The Supreme Court has made clear that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory ... provision." Davis v. Scherer , 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Instead, government officials are "liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages." Id. at 194, 104 S.Ct. 3012 n.12. They do not "lose their immunity by violating the clear command of a statute ... unless that statute ... provides the basis for the cause of action sued upon." Id. Here, the district court failed to consider whether the charges could be considered under this standard.

Flint requests that we either certify the question of whether Public Act 436 transforms municipalities into arms of the state to the Michigan Supreme Court, or delay our opinion "until after Michigan courts have had an opportunity to answer it." Certification is not appropriate here-Flint did not make the same request to the district court and we have the appropriate data points to address the issue. See, e.g. , In re Amazon.com, Inc., Fulfillment Ctr. Fair Labor Standards Act (FLSA) & Wage & Hour Litig. , 852 F.3d 601, 607-08 (6th Cir. 2017).

Citing Cash v. Granville County Board of Education , 242 F.3d 219 (4th Cir. 2001), Flint quizzically argues it can separately show it is entitled to Eleventh Amendment immunity under a "sovereign dignity" inquiry independent from the traditional Ernst factor test set forth in text. This argument is not well-taken. For one, we are bound by our en banc decision in Ernst , not the Fourth Circuit's decision in Cash . For another, Cash does not hold, as Flint suggests, that "[e]ven if a defendant fails the Ernst test, it may still enjoy sovereign immunity if the judgment would adversely affect the dignity of the State as a sovereign." Rather, it holds consistent with our caselaw, that the "state purse" factor is foremost, but in certain situations "sovereign dignity factors"-i.e., Ernst factors two, three, and four-can lead to a finding of sovereign immunity. Id. at 224 ; see also Pucci , 628 F.3d at 761. Put differently, our Ernst factors already take state dignity into account when evaluating application of the Eleventh Amendment.

Michigan's Court of Claims Act grants the Michigan Court of Claims exclusive jurisdiction "[t]o hear and determine any claim or demand, statutory or constitutional ... against the state or any of its departments or officers." Mich. Comp. Laws § 600.6419(1)(a). The issue presented in Boler v. Governor was whether claims arising out of the Flint Water Crisis against Flint were within the exclusive jurisdiction of the Court of Claims. Although it is strictly a statutory interpretation case, we find its analysis persuasive for it provides extensive discussion about the relationship between Michigan and its political subdivisions.