NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0373n.06

No. 23-1954

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| DARETHA BRAZIEL et al., | ) | |
| Plaintiffs-Appellees, | ) | **FILED** |
| | ) | Aug 28, 2024 |
| v. | ) | KELLY L. STEPHENS, Clerk |
| | ) | |
| GRETCHEN WHITMER et al., | ) | ON APPEAL FROM THE |
| Defendants, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| MARCUS MUHAMMAD et al., | ) | |
| Defendants-Appellants. | ) | OPINION |
| | ) | |
| | ) | |

Before: MOORE, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.

MOORE, J., delivered the opinion of the court in which BLOOMEKATZ, J., joined in full, and NALBANDIAN, J. joined in part. NALBANDIAN, J. (pp. 26–28), delivered a separate opinion dissenting in part.

**KAREN NELSON MOORE, Circuit Judge.** Both the federal and Michigan governments have promulgated regulations for testing and addressing lead in localities' water supplies. In 2018, the water in Benton Harbor, Michigan, tested above the acceptable lead level, and the city was subsequently legally obligated to take a number of actions to bring the levels down. From 2018 to 2021, the city continued to post testing results above the statutorily permissible levels, and a number of employees were viewed as having mismanaged the crisis, including Mayor Marcus Muhammad ("Muhammad") and Benton Harbor's Water Plant Operator Mike O'Malley ("O'Malley"). In late 2021, a number of Benton Harbor citizens ("the Plaintiffs")

filed a putative class action against Muhammad, O'Malley, and the city of Benton Harbor, along with numerous other individuals and entities, claiming that they had violated the Plaintiffs' constitutional right to bodily integrity. Muhammad, O'Malley, and Benton Harbor filed a motion to dismiss, arguing that Muhammad and O'Malley were entitled to qualified immunity from the suit and that there was no municipal liability on Benton Harbor's behalf. The district court granted qualified immunity to a number of individuals but denied Muhammad's and O'Malley's claims of qualified immunity. It also found that the Plaintiffs had sufficiently alleged a claim against Benton Harbor. Muhammad, O'Malley, and Benton Harbor appealed. For the reasons explained below, we REVERSE the district court's ruling with regard to Muhammad and Benton Harbor, AFFIRM the district court's ruling with regard to O'Malley, and REMAND for proceedings consistent with our opinion.

## I. BACKGROUND

The Safe Drinking Water Act grants the Administrator of the Environmental Protection Agency ("EPA") the authority to regulate "national primary drinking water" and "public water systems," which includes the ability to "publish maximum [or sufficient] contaminant level goal[s]." 42 U.S.C. §§ 300f, 300g-1(b)(1)(A). The EPA can give states "primary enforcement responsibility" for their public water systems, provided that the state adopts "drinking water regulations that are no less stringent than the national . . . regulations." 42 U.S.C. § 300g-2(a)(1). Under Michigan law, the "department of environmental quality" holds "power and control over public water supplies and suppliers of water." MICH. COMP. LAWS § 325.1002–03. This state department (Department of Environment, Great Lakes, and Energy, or "EGLE") also sets the appropriate treatment techniques for lead and copper in public water supplies (the "Lead and Copper Rule"). R. 142-3 (Onan Decl. ¶ 1) (Page ID #1771); MICH. ADMIN. CODE R. 325.10604f.

Michigan's Lead and Copper Rule provides that a public water supply's "lead action level is exceeded if the ninetieth percentile lead level is more than 0.015 milligrams per liter (mg/l) in tap water samples collected during a monitoring period." MICH. ADMIN. CODE R. 325.10604f(1)(c). If a water supply exceeds its lead action level, the governing authority that monitors for lead and copper must "deliver a consumer notice of . . . monitoring results to" the people who are served by that water supply, issue a public advisory, and deliver education materials regarding the monitoring results.[1] MICH. ADMIN. CODE R. 325.10410(1). The entity in charge of the water supply also must "offer to arrange for sampling the tap water of a customer who requests [it]" but is not required to pay for the sampling. *Id.* In 2018, Michigan implemented new regulations, which shifted the financial responsibility for maintaining water service lines from homeowners to municipalities and revised how sample sites are to be selected for testing. MICH. ADMIN. CODE R. 325.10604f(5)(c); R. 148-1 (Lead & Copper Rule Revision Summ. at 1–2) (Page ID #4066–67).

Benton Harbor receives its water from Lake Michigan, which does not contain lead. R. 146-16 (Nov. 30, 2018 Notice at 2) (Page ID #3165). Benton Harbor's water supply system is over 100 years old, though, and at least some portion of the homes that it serves is "likely to have some type of lead component in [their] service line[s]." R. 142-10 (Water Service Inspection Project Info. at 1) (Page ID #1863); *see also* R. 146-16 (Nov. 30, 2018 Notice at 2) (Page ID #3165). Water sitting for several hours in service lines made of or containing lead can dissolve the lead (along with other metals), which can result in lead entering the water supply from those

---

[1]The individuals who are "served by the water supply at sites that are tested" receive "a consumer notice of lead and copper tap water monitoring results." MICH. ADMIN. CODE R. 325.10410(1). If the supply "exceeds the lead action level," the water supply must abide by the public education requirements set out in Michigan's Lead and Copper Rule. *Id.*

pipes. R. 146-16 (Nov. 30, 2018 Notice at 2) (Page ID #3165). In March 2018, Benton Harbor received a state grant of $284,000 "to replace lead and galvanized steel water service lines." R. 146-6 (May 11, 2018 Herald-Palladium Article at 1) (Page ID #3012). O'Malley estimated that at the time the city received the grant, "60 percent of the houses in Benton Harbor ha[d] lead and/or galvanized steel water lines from the main water line to the house." *Id.* The city intended to use the grant money "to replace the water lines to at least 200 homes," focusing on galvanized steel pipes, which can collect lead. *Id.* Lead in water sources is dangerous to all citizens but poses a particular risk to children, as lead can impact their brain and nervous system health, growth and development, learning, behavior, hearing, and speech. R. 146-52 (Sept. 22, 2021 Det. Free Press Article at 3) (Page ID #3714).

During Benton Harbor's lead and copper monitoring from June 1, 2018, to September 30, 2018, the "community water supply's ninetieth percentile exceeded the [lead action level]."[2] R. 146-13 (Oct. 22, 2018 EGLE Mem. at 1) (Page ID #3139). After the preliminary results of the survey were released, representatives from Benton Harbor and EGLE met on September 14, 2018, to discuss the findings and "begin discussion of a corrective action plan." R. 142-44 (Oct. 3, 2018 Violation Notice at 4) (Page ID #2201). On October 3, 2018, after testing was complete, EGLE sent Muhammad and City Manager Darwin Watson ("Watson") a "Significant Deficiency Violation Notice," which "confirm[ed] meetings with Benton Harbor staff on multiple dates in 2017 and 2018" and stated that the survey's findings "led [them] to the determination [that] the water supply currently lack[ed] the financial and managerial capacity to meet all the requirements

---

[2]The ninetieth percentile of samples for lead was 22 ppb, which exceeds the action level of 15 ppb. R. 146-13 (Oct. 22, 2018 EGLE Mem. at 1) (Page ID #3139).

of Act 399."[3] *Id.* at 1 (Page ID #2198). Benton Harbor's "significant deficiencies" violated Act 399 and had to "either be resolved within 120 days or be included in an approved corrective action plan." *Id.* at 2 (Page ID #2199).

The violation notice stated that Benton Harbor had "made significant efforts to maintain and improve [its] historically neglected water system" since the last sanitary survey in 2015. *Id.* at 1 (Page ID #2198). The notice, however, also identified "a number of areas" that required Benton Harbor's immediate attention, including an "adequate financial mechanism to conduct necessary improvements or hire necessary staff to properly maintain and operate the water system." *Id.* The notice advised Benton Harbor about certain steps it must take, such as "hir[ing] separate certified operators to oversee the distribution system and the water treatment facility," *id.* at 2 (Page ID #2199); installing an "[a]dequate rapid mix for [a sufficient] primary coagulant,"[4] *id.* at 3 (Page ID #2200); placing an "[a]ccurate chlorine analyzer" in its plants and recording and reporting minimum levels daily to the DEQ, *id.*; and "dedicat[ing] a trained staff person to implement" a "comprehensive control program" for eliminating and preventing "all cross connections," *id.*

On October 10, 2018, Benton Harbor's city operator emailed EGLE to inform them about "exceedance of lead in water samples collected by Benton Harbor." R. 142-3 (Decl. Brandon

---

[3]Act 399 refers to Michigan's Safe Drinking Water Act. 1976 Mich. Pub. Acts 399 (codified as MICH. COMP. LAWS § 325.1001 *et seq.*).

[4]Coagulation involves adding chemicals with a positive charge to the supply at water treatment plants, in order to "neutralize the negative surface charge present on most particulate matter." *TECH-TIP – Tips for Optimizing Coagulation*, AM. WATER WORKS ASS'N (Sept. 28, 2016), https://www.awwa.org/AWWA-Articles/tech-tip-tips-for-optimizing-coagulation. The notice explains that "sufficient primary coagulant[s]" have to be added to the water supply in order to "create a settleable or filterable floc [a larger, heavier mass consisting of a clump of non-settling particles in the water supply] at all times." R. 142-44 (Oct. 3, 2018 Violation Notice at 3) (Page ID #2200); *see Coagulation and flocculation*, ENCYC. BRITANNICA ONLINE, https://www.britannica.com/technology/water-supply-system/Coagulation-and-flocculation (last visited June 20, 2024) (defining "floc").

Onan ¶ 5) (Page ID #1772). Other water systems that were similar to Benton Harbor's (in that they also had "lead components," used Lake Michigan as a water source, and used a "treatment protocol that does not include a corrosion control additive") did not experience a similar lead exceedance. *Id.* ¶ 6. After notifying EGLE about its results on October 22, 2018, Benton Harbor issued a public advisory about its drinking water, alerting its citizens that the lead in the water supply pipes had exceeded its lead action level and providing ways that they could "reduce [their] risk of lead exposure." R. 146-7 (Oct. 22, 2018 Advisory at 1) (Page ID #3015). Tips included running water to "stable, cold temperatures . . . before drinking to flush out any potential contaminants," preparing baby formula with bottled water, and refraining from boiling water before use. *Id.* The advisory urged that the "most important thing" that residents could do was "run [their] water to flush out potential lead contaminants." *Id.* Muhammad, Watson, and the county's Medical Director Dr. Rick Johansen ("Johansen") held a press conference on October 23, 2018, announcing Benton Harbor's higher-than-permissible lead levels and stating that they were a "concern, but [] not an emergency." R. 146-15 (Oct. 25, 2018 Herald-Palladium Article at 1) (Page ID #3160). The officials also informed Benton Harbor residents that they could pick up free water-testing kits and submit them to the city for testing, *id.* at 1–2 (Page ID #3160–61), and the city eventually provided water filters to its residents, *see* R. 146-57 (Feb. 4, 2019 News Release at 1) (Page ID #3738). Numerous Benton Harbor residents later provided feedback "that they either didn't know about the 2019 filter distribution or didn't know how to install or maintain the filters." R. 146-52 (Sept. 22, 2021 Det. Free Press Article at 2) (Page ID #3713).

On December 9, 2018, O'Malley filled out and signed a Summary of Public Education Requirements and Certificate of Distribution, which included a checklist of items that the city was legally required to undertake to address the lead in its water and which indicated when the city had

taken or planned to take each action. R. 146-18 (Summ. of Pub. Educ.) (Page ID #3172–81). A citizen contacted the city in January 2019, stating that she had received a letter from the city advising "that the water [was] safe to drink after a first flush," and that she had called the number on the letter and spoken with O'Malley, who "somewhat rudely advised her the city [was] delivering 'clean water right to the tap and [she] should have no trouble drinking it.'" R. 146-19 (Jan. 9, 2019 Email 1) (Page ID #3183). O'Malley also reported that he had been advising residents that they could drink the water provided they "let[] it run for a few minu[te]s," and that Benton Harbor was not providing filters or bottles "for anyone (even homes over the action level) because they provide clean water 'right to their spout.'" *Id.* at 2 (Page ID #3184). Internal emails within the Benton Harbor government show that other municipal employees found this information "troubl[ing]" and had been "under the impression that [Benton Harbor] was . . . providing water or filters like they said they would." *Id.* at 1 (Page ID #3183).[5] Later in 2019, an EGLE employee expressed that he had some "concerns regarding Benton Harbor," stating that EGLE had struggled to communicate with the city (which was routinely missing deadlines) and that the issues with the water supply went well beyond the lead-testing results. R. 71-6 (Dec. 18, 2019 Email at 2) (Page ID #947).

In early 2019, Benton Harbor issued a press release, which increased "the recommended flushing time for water . . . from three to five minutes to at least five minutes," advised residents to "[u]se cold tap water for drinking and cooking," and reported that there had "been no detected increases in the number of elevated blood lead levels in Benton Harbor children." R. 71-11 (Jan.

---

[5]This language came from Nicki Britten, who was employed as "a health officer with the county health department" at the time. *See Benton Harbor Residents to Get Free Water Filters*, ASSOCIATED PRESS (Jan. 25, 2019), https://apnews.com/general-news-3c26f1fe1b5b4dfd9ddc05987580b9ec.

23, 2019 Press Release) (Page ID #1039–40). The city continued to take steps to address the lead in the water, including beginning the replacement of the lead service lines, introducing "new corrosion controls in the water supply," and continuing to provide education and resources for its citizens. R. 146-8 (July 26, 2019 Release at 1) (Page ID #3018). Benton Harbor also contracted with Elhorn Engineering Company ("Elhorn") to create and implement a "Corrosion Control Treatment Plan," R. 146-24 (Corrosion Treatment Plan) (Page ID #3262) and, as mandated by the Lead and Copper Rule, "conduct[ed] ongoing testing of the City's water supply," R. 146-8 (July 26, 2019 Release at 1) (Page ID #3018). During the "ongoing compliance testing, it was found that water samples" collected from forty-seven residences from January 2019 to June 2019 still exceeded the Action Level for lead. *Id.* O'Malley reported in November 2019 that lead levels "appear[ed] to be dropping," and that the results from coating the water supply's pipes so that water would not come into contact with the lead pipes was "having an impact sooner than" expected. R. 146-37 (Nov. 14, 2019 Herald-Palladium at 1) (Page ID #3331). However, in early 2020, EGLE wrote to Benton Harbor that "[a] review of the last three lead and copper sampling rounds . . . concludes the treatment is not achieving desired results quickly enough." R. 142-21 (Feb. 13, 2020 EGLE Letter at 1) (Page ID #1992). In July 2020, sampling results showed that the city continued to exceed the action level. R. 142-37 (July 22, 2020 Herald-Palladium Article at 1) (Page ID #2168).

On November 5, 2020, O'Malley received a letter from EGLE, informing him that EGLE was "considering commencing action against both" his Class F-1 and S-1 drinking water certifications. R. 146-20 (Nov. 5, 2020 Letter at 1) (Page ID #3186). According to EGLE, they believed that O'Malley had "falsified the August and September 2020 monthly operation reports [] for the city of Benton Harbor and [] knowingly violat[ed] environmental and drinking water

regulations." *Id.* An EGLE employee, Ernest Sarkipato ("Sarkipato"), described O'Malley's approach to implementing EGLE's treatment designation as "sporadic," and stated that EGLE had "performed a review and determined that [Benton Harbor] had not sent public education materials to all water users as required[.]" R. 142-33 (Sarkipato Decl. ¶¶ 5–7) (Page ID #2153–54). In September 2021, emails between state employees and Andy Leavitt ("Leavitt"), a state consultant, reveal Leavitt's concerns that the pamphlets Benton Harbor distributed did not sufficiently inform the city's residents about the risks associated with the lead in the water. R. 71-14 (Sept. 30, 2021 Emails at 1–2) (Page ID #1057–58).

Once O'Malley was removed in 2020,[6] a firm called F&V Operations was brought in to take his place, after which "Benton Harbor finally began to consistently achieve the treatment target by May 2021." R. 142-33 (Sarkipato Decl. ¶ 6) (Page ID #2153). In September 2021, Governor Gretchen Whitmer ("Whitmer") and EGLE announced a proposed $200 million expansion of Michigan's Clean Water Act, which would include $20 million to replace all of Benton Harbor's lead water service lines. R. 146-51 (Sept. 8, 2021 Press Release at 1) (Page ID #3704). Whitmer also issued a directive that took various action steps, such as ensuring that residents had "access to free bottled water until further notice," R. 146-62 (Oct. 14, 2021 Press Release at 1) (Page ID #3751), which the state continued into 2022, R. 146-58 (Apr. 25, 2022 Press Release at 1) (Page ID #3741).[7]

---

[6]According to the Plaintiffs' complaint, O'Malley took a leave of absence in 2020, and his certifications were revoked in 2021. R. 82 (2d Am. Compl. ¶ 29) (Page ID #1123).

[7]Before the 2021 directive, it appears that Benton Harbor made bottled water available, "but only for pickup at City Hall," and without properly informing its residents about the availability of bottled water. R. 142-3 (Decl. Brandon Onan ¶ 14) (Page ID #1774–75). It is unclear from the record how long, or at what intervals, the bottled water was available from Benton Harbor.

Residents of Benton Harbor filed a putative class action lawsuit against Appellants Muhammad and O'Malley in their individual and official capacities and the City of Benton Harbor, along with other state and local officials (in their individual and official capacities) and entities. R. 1 (Compl. 1–2) (Page ID #1–2); R. 82 (2d Am. Compl.). The Plaintiffs alleged that the Benton Harbor Defendants (including Muhammad and O'Malley) had violated their "liberty interest [in] bodily integrity" pursuant to the Due Process Clause when they "deliberately and knowingly caused, maintained, and covered up" the lead in the water supply system and "failed to take reasonable actions to protect" the Benton Harbor residents. R. 82 (2d Am. Compl. ¶¶ 147–48) (Page ID #1163–64). The Benton Harbor Defendants had, according to the Plaintiffs, known "of the facts [from] which they could infer a substantial risk of serious harm," inferred it, and "acted with indifference toward the individual[s'] rights." *Id.* ¶ 149 (Page ID #1165). This conduct, according to the Plaintiffs, "was so egregious and so outrageous[] that it 'shock[ed] the conscience.'" *Id.*

In his Report and Recommendation, the magistrate judge recommended that the State's Rule 12(b)(1) motion to dismiss on the ground of Eleventh Amendment immunity be denied; that the State's Rule 12(b)(6) motion to dismiss for failure to state a federal claim be granted; that Benton Harbor's Rule 12(b)(1) motion to dismiss be denied; that Benton Harbor's 12(b)(1) motion to dismiss for failure to state federal claims be granted; and that the district court should decline to exercise supplemental jurisdiction over the state-law claims and dismiss them without prejudice. R. 173 (R. & R. at 41) (Page ID #4563). The district judge adopted the Report and Recommendation to the extent that it dismissed all Defendants other than Muhammad, O'Malley, and Benton Harbor and rejected the magistrate judge's recommendation as to the substantive-due-process claims against these three Defendants. *Braziel v. Whitmer*, No. 1:21-cv-960, 2023 WL

6304907, at *10 (W.D. Mich. Sept. 28, 2023). The district judge also declined to exercise supplemental jurisdiction over the state-law claims. *Id.*

## II. DISCUSSION

### A. Standard of Review

We review de novo claims of qualified immunity. *Jackson v. City of Cleveland*, 64 F.4th 736, 743 (6th Cir. 2023). "At the motion-to-dismiss stage, a plaintiff's 'complaint must contain sufficient factual matter, accepted as true, to state "a claim to relief that is plausible on its face."'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In our review, we must view the Complaint's allegations as true. *In re Flint Water Cases*, 960 F.3d 303, 324 (6th Cir. 2020). In a recent opinion, we reiterated that "'it is generally inappropriate' to find an officer entitled to qualified immunity at the early stage of a Rule 12 motion." *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1003 (6th Cir. 2024) (quoting *Moderwell v. Cuyahoga County*, 997 F.3d 653, 661 (6th Cir. 2021)). *Saalim* noted that it can be "difficult to determine '"whether the facts of [a] case parallel a prior decision or not" for purposes of determining whether a right is clearly established.'" *Id.* (quoting *Moderwell*, 997 F.3d at 660–61). In reaching a conclusion, we must balance this reasoning with the understanding that qualified immunity provides a defense against having to litigate a suit at all.

### B. Qualified Immunity

For a claim to survive a motion to dismiss based on qualified immunity, plaintiffs must adequately plead "facts showing (1) that [a public] official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *In re Flint Water Cases*, 960 F.3d at 323 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). We apply a "two-tiered inquiry" in our review of a district court's denial of a motion to dismiss on qualified-immunity grounds. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)

(quoting *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015)). First, we must determine whether the plaintiff's facts, if accepted as true, sufficiently allege a violation of a statutory or constitutional right. *Id.* Second, we must "ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). We may answer the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). If the plaintiff cannot satisfy either step, the government official is entitled to qualified immunity and is shielded from civil damages. *Courtright*, 839 F.3d at 518.

### 1. Mayor Muhammad

The Plaintiffs alleged that Mayor Muhammad violated their constitutional right to bodily integrity by mishandling the lead water crisis in Benton Harbor. R. 82 (2d Am. Compl. ¶ 147) (Page ID #1163–64); Appellees Br. at 12, 24. The district court denied qualified immunity to Muhammad on this claim, because it found that it could "infer from other allegations in the complaint that Muhammad was aware of the lead contamination" and that the Plaintiffs contended that, despite this awareness, Muhammad "repeatedly misled the public" about the danger the lead posed. *Braziel*, 2023 WL 6304907, at *7. On appeal, Muhammad argues that the district court erred in denying him qualified immunity because the Plaintiffs' allegations against him are conclusory and "insufficient to state a constitutional claim," Appellants Br. at 9, and at most identify a "failure to act," rather than a "constitutionally improper government action," *id.* at 12. The Plaintiffs claim that Muhammad adopts too narrow a reading of their complaint and that Muhammad made "specific statements . . . that the water was safe to drink, that corrosion control measures, flushing, and filtering worked," despite knowing that Benton Harbor's water was unsafe to use or drink. Appellees Br. at 32–33.

We have found that government officials who play a "role in creating, sustaining, and covering up [a water crisis]" have "violate[d] [the victims'] right to bodily integrity," and that this right to bodily integrity is clearly established under the Due Process Clause of the Fourteenth Amendment. *In re Flint Water Cases*, 960 F.3d at 323; *see also Guertin v. Michigan*, 912 F.3d 907, 918 (6th Cir. 2019). Even on their own, public statements by government officials misleading and lying to the public about the safety of the water supply can suffice to establish a constitutional violation. *In re Flint Water Cases*, 960 F.3d at 329–30. When plaintiffs allege that an official acted with deliberate indifference and/or recklessly, as they appear to be doing here, we evaluate the circumstances and consider factors such as "whether the defendants had time to deliberate" and whether the defendants' actions had a "legitimate government purpose" to determine if "'the generally alleged conduct [i]s . . . egregious.'" *In re Flint Water Cases*, 960 F.3d at 323–24 (alteration in original) (quoting *Guertin*, 912 F.3d at 925). An official has acted with deliberate indifference when their actions have "shock[ed] the conscience"—that is, when the official "knew of facts from which they could infer a substantial risk of serious harm, [] did infer it, and [] acted with indifference toward [an] individual's rights." *Id.* at 324 (quoting *Guertin*, 912 F.3d at 926). This standard, "which we have 'equated with subjective recklessness,'" poses a "particularly high hurdle" for plaintiffs. *Guertin*, 912 F.3d at 926 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002)).

Muhammad was Benton Harbor's mayor during the entire relevant period of the city's lead crisis. The city communicated with its citizens regarding the lead in its water after Benton Harbor's positive 2018 test, but it does not appear that the pamphlets and other materials contained all of the necessary relevant information, provided accurate information about dealing with lead in the water, or reached all the citizens who were affected by the lead. *See, e.g.*, R. 71-14 (Sept.

30, 2021 Emails at 2–3) (Page ID #1058–59); *cf. In re Flint Water Cases*, 960 F.3d at 331–32. Although Benton Harbor's response to the lead water crisis was far from ideal, "simply making bad choices does not rise to the level of deliberate indifference." *Guertin*, 912 F.3d at 924. Rather, the relevant question is whether the district court erred in concluding that the Plaintiffs had sufficiently pleaded facts that demonstrated that Muhammad had known of the dangers posed by lead and knowingly acted with deliberate indifference in his response to the crisis.

The Plaintiffs argue that the district court did not err in denying Muhammad's motion for dismissal based on qualified immunity because he was the mayor of Benton Harbor and during that time, he "knew that lead was dangerous in any concentration, failed to warn residents of the crisis in Benton Harbor's water, failed to follow notice and public education requirements, and covered up the crisis." Appellees Br. at 27. Specifically, the Plaintiffs claim that Muhammad "knowingly and falsely assured residents that the water was safe to drink" when it was not, "knowingly and falsely" claimed that certain measures could remove lead from the water, and "knowingly and falsely assur[ed] residents that no children had ingested lead." *Id.*

In general, we hesitate to conclude that an officer is "entitled to qualified immunity at the early stage of a Rule 12 motion." *Saalim*, 97 F.4th at 1003 (quoting *Moderwell*, 997 F.3d at 661). Even in the early stages in litigation, though, plaintiffs must "plead sufficient facts to state a claim," *Iqbal*, 556 U.S. at 687, and their "factual allegations must state a plausible claim." *In re Flint Water Cases*, 960 F.3d at 322–23 (citing *Guertin*, 912 F.3d at 916). *See also Boxill v. O'Grady*, 935 F.3d 510, 517 (6th Cir. 2019) ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (quoting *Iqbal*, 556 U.S. at 678). For example, in the earlier Flint Water Cases, the plaintiffs pointed to actions that officials took such as forcing a switch in water supplies when they were aware of "water quality issues" and the

14

possibility of lead contamination; "distort[ing] water quality tests to downplay the extent of the lead contamination," even when that official knew that the lead was dangerous; and "stonewall[ing]" attempts to investigate the water supply issues. *In re Flint Water Cases*, 960 F.3d at 325–27.

The Plaintiffs have not satisfied their pleading burden with regard to their claim that Muhammad violated their right to bodily integrity. The Plaintiffs have not pointed to any specifics that would tend to lend plausibility to their claims that Muhammad had acted with deliberate indifference, nor did the district court discuss any such specifics in denying Muhammad's motion for dismissal. *Cf. id.*; *see Braziel*, 2023 WL 6304907, at *7 (noting that the Plaintiffs "identifie[d] no particular statement by Defendant Muhammad"). Although the Plaintiffs allege generally that Muhammad made a number of knowing and false statements regarding the safety of the water and measures to address lead in the water, they do not point to any specific statements that Muhammad himself made. *See* R. 82 (2d Am. Compl. at ¶¶ 14, 26, 107) (Page ID #1118, 1122, 1153); *see also* Appellees Br. at 27. In their complaint, the Plaintiffs claimed that Muhammad failed to notify residents about the lead levels and "was fully aware of the high lead levels" but that he "did not follow the notice and public education required by federal and State Safe Drinking Water laws." R. 82 (2d Am. Compl. ¶ 26) (Page ID #1122). The most specific statement that the Plaintiffs included in their complaint is an assertion that Muhammad was "falsely telling the public . . . that the tap water was safe to drink." *Id.* ¶ 107 (Page ID #1153). Nothing else in the complaint indicates the press releases ascribed to Muhammad were made with the knowledge that they were false, nor do the Plaintiffs identify in their brief other statements or actions that are attributable to Muhammad specifically and that would tend to support their claims that Muhammad acted with deliberate indifference in responding to the lead water crisis.

Although we recognize that the response to Benton Harbor's water crisis was far from perfect, the complaint does not provide any statement or action by Muhammad that would indicate that he had acted with deliberate indifference in causing or dealing with the crisis. The Plaintiffs' burden is not a particularly heavy one at this stage of the litigation, but they still must assert more than mere conclusory statements against Muhammad for their Fourteenth Amendment substantive-due-process claim against him to move forward. *See Boxill*, 935 F.3d at 517. Because the Plaintiffs have not sufficiently pleaded facts that would make out a claim of deliberate indifference against Muhammad, we REVERSE the district court's denial of the motion to dismiss this claim.

## 2. Water Plant Operator O'Malley

The Plaintiffs also claimed that Water Plant Operator Michael O'Malley violated their right to bodily integrity under the Fourteenth Amendment's Due Process Clause with his actions leading up to and responding to the lead water crisis. The district court found that the Plaintiffs' allegations that O'Malley had made "repeated false statements to the public about the safety of the City's water" sufficed to suggest that he had violated their constitutional right to due process by making "deliberately misleading" statements that the Plaintiffs had relied on, and the district court denied O'Malley's motion to dismiss based on qualified immunity. *Braziel*, 2023 WL 6304907, at *5. On appeal, O'Malley also argues that the district court erred in denying his motion to dismiss based on qualified immunity, asserting that there is "no factual basis" for the allegations against him, and that the Plaintiffs have done nothing more than make "general and conclusory statements" in their claim. Appellants Br. at 13.

The Plaintiffs point to a few more specific statements and actions with regard to O'Malley than they did with regard to Muhammad. For example, in their complaint, the Plaintiffs noted that O'Malley "failed to follow and violated the federal and State of Michigan Safe Drinking Water

16

Acts requirements and guidelines," and was "fired from his position [in] 2020 for intentionally falsifying Water Department documents." R. 82 (2d Am. Compl. ¶¶ 204–06) (Page ID #1177); *see also* Appellees Br. at 10 (stating that O'Malley's failure to "follow state and federal notice and public education requirements" led to his license being revoked). EGLE employees had expressed concern that Benton Harbor was missing deadlines and had "multiple significant deficiencies," *see, e.g.*, R. 71-6 (Dec. 18, 2019 Email 2) (Page ID #947), and that O'Malley was telling residents that the water supply was safe to drink when it was not, *see* 146-19 (Jan. 9, 2019 Email 1–2) (Page ID #3183–84). O'Malley had prepared and signed the Summary of Public Education Requirements packet in response to the lead crisis, which includes a checklist of steps Benton Harbor was to take in response to the lead in the water, and what appears to be boilerplate language regarding what citizens can do to reduce their exposure to lead, including running the water to "flush out lead." R. 146-18 (Summ. of Pub. Educ.) (Page ID #3172–81). The district court considered the claim that O'Malley had "failed to follow state and federal guidelines for the selection and use of anti-corrosion measures," but concluded that the allegation was vague, and suggested negligence, rather than deliberate indifference, on O'Malley's part. *Braziel*, 2023 WL 6304907, at \*5. The district court determined, however, that the Plaintiffs' allegations that O'Malley had "repeatedly denied, lied and covered up" the safety of Benton Harbor's water supply were "sufficient to state a substantive due process claim against O'Malley." *Id.*

The relevant question with regard to O'Malley is whether the Plaintiffs have sufficiently pleaded facts that create a plausible claim against O'Malley of deliberate indifference, rather than simply poor decision-making. Many of the Plaintiffs' statements about O'Malley's actions leading up to and during the water crisis are conclusory. For example, although the Plaintiffs stated in their complaint that O'Malley was fired from his position "for intentionally falsifying Water

17

Department documents," they do not identify any factual basis for this claim, nor do they provide any explanation about what the falsified documents are, how they are connected to the lead water crisis, or how O'Malley's actions would constitute deliberate indifference to their right to bodily integrity. R. 82 (2d Am. Compl. ¶ 206).

Unlike their claim against Muhammad, though, the Plaintiffs have some detailed factual allegations underlying their contention that O'Malley led the residents of Benton Harbor to use water that he knew was unsafe. In analyzing the allegations against O'Malley, we first note his role. As the Water Plant Operator of Benton Harbor, O'Malley "was charged with ensuring that the water services provided to Benton Harbor customers were safe . . . and was required to file a monthly report with the EGLE." R. 82 (2d Am. Compl. ¶ 29) (Page ID #1123). Unlike Muhammad, the responsibilities of O'Malley's position gave him personal knowledge about the potability of Benton Harbor's water. And as the Water Plant Operator, O'Malley played a "pivotal role" in Benton Harbor's response to the water crisis. *Guertin*, 912 F.2d at 927. So he would have known if the Benton Harbor water supply "was rife with public-health-compromising complications," as the Plaintiffs allege. *Id.*

The Plaintiffs further alleged that "O'Malley repeatedly denied, lied, and covered up [the] public health emergency and crisis by repeatedly telling Benton Harbor residents and the public that the water was safe to drink." R. 82 (2d Am. Compl. ¶ 205) (Page ID #1177); *see also* Appellees Br. at 26 ("O'Malley intentionally caused and concealed the fact and urgency of the lead contamination crisis" by "fail[ing] to follow the notice and public education required by law, and . . . provid[ing] knowingly false and misleading information.").

Those allegations are supported by emails plausibly demonstrating that O'Malley misled residents about the safety of the water and the effectiveness of "flushing," and further misled state

regulators about the mitigation measures that were being provided to residents who received contaminated water. *See, e.g.*, R. 146-19 (Jan. 9, 2019 Email 3) (Page ID #3184); *see also* R. 146-20 (Nov. 5, 2020 Letter 5) (Page ID #3190) (documenting that O'Malley "refused to supply location information for lead and copper sampling on either the [EGLE] lab sheets or the certification forms"). The Plaintiffs also cite at least one specific statement attributable to O'Malley to this effect: he allegedly told a local resident "that even in the homes that tested above the 15 ppb limit for lead, after the 'first flush it was okay to drink and cook' the tap water because 'they (Benton Harbor water supply) provide clean water right to their spout.'" R. 82 (2d Am. Compl. ¶ 106) (Page ID #1153).[8] It appears that the local resident had reached out to O'Malley via a phone number listed on a letter from the city and, after O'Malley informed her that clean water was being delivered to the tap and was potable, that local resident reached out to both Sarkipato and Isabel Marrah ("Marrah"), who works at a nonprofit called Freshwater Future. R. 146-19 (Jan. 9, 2019 Email 1–2) (Page ID #3183–84). Marrah called O'Malley after the local resident contacted her, and O'Malley stated to Marrah that "they [were] advising residents (even the 40+ homes that tested above 15 ppb) to continue to drink the water after letting it run for a few minu[te]s" and that "after [the] first flush it's okay to drink and cook with." *Id.* at 2 (Page ID

---

[8]The district court considered and disregarded this statement because "a single false statement to a City resident does not suggest deliberate indifference and does not shock the conscience." *Braziel*, 2023 WL 6304907, at *5. A single statement to one resident, by itself, may generally not suffice to demonstrate deliberate indifference. At this stage in the proceedings, however, we consider this statement as sufficiently supporting the Plaintiffs' pleading that O'Malley had repeatedly lied about the water crisis and, in doing so, had violated their right to bodily integrity. The dissenting opinion takes issue with this statement, characterizing it as "one isolated false statement to one individual with no connection to any plaintiff." Dissenting Op. at 28. But the statement still supports the Plaintiffs' plausible allegations that O'Malley lied about and covered up the issue with Benton Harbor's water supply by providing false information regarding its potability to the city's citizens. R. 82 (2d Am. Compl. ¶ 107) (Page ID #1153).

#3184).  O'Malley also told Marrah that "they [were] not providing filters or bottles for anyone (even homes over the action level) because they provide clean water 'right to their spout.'" *Id.*

In the Flint Water Cases, we considered statements from Bradley Wurfel, the official to whom the Plaintiffs here attempt to draw parallels, "that 'residents of Flint do not need to worry about lead in their water supply'" when concluding that the Flint plaintiffs had "plausibly demonstrated deliberate indifference" toward their right to bodily integrity.  *In re Flint Water Cases*, 960 F.3d at 329 (citation omitted).  The dissenting opinion disagrees with our comparing O'Malley to Wurfel and claims that the better analogue to O'Malley is Nick Lyon ("Lyon"), who served as the director of the Michigan Department of Health and Human Services during the Flint Water Crisis.  Dissenting Op. at 27–28.  In the Flint Water Cases, we concluded that the district court had erred in denying Lyon's motion to dismiss because "[a]t most, [the] plaintiffs ha[d] alleged Lyon . . . [was] unjustifiably skeptical of [a pediatrician's study of the water] and [was] hoping to assemble evidence to disprove it."  *Guertin*, 912 F.3d at 930–31.  We disagree with the dissent's attempt to cast O'Malley in a similar light.  O'Malley was in charge of Benton Harbor's water supply and, according to the Plaintiffs, repeatedly provided incorrect information to the city's citizens about how to handle the lead measurements.  As the Water Plant Operator, "O'Malley was charged with ensuring that the water services provided to Benton Harbor customers were safe and did not jeopardize their health and safety and [he] was required to file a monthly report with the EGLE."  R. 82 (2d Am. Compl. ¶ 29) (Page ID #1123).  It is entirely plausible that O'Malley's position as the Water Plant Operator, whose duties included liaising with the EGLE, meant that he was one of the individuals involved in or causing the missed deadlines.

Contrary to the dissenting opinion, we view O'Malley as more analogous to Wurfel. Unlike Lyon, against whom the sole allegation was that he attempted to discredit a pediatrician's

20

study, the Plaintiffs here have alleged that, like Wurfel, O'Malley violated their right to bodily integrity by repeatedly issuing knowingly false statements to the public about the safety implications of the lead in the water and the steps that citizens should take to address those concerns. *Id.*; *see In re Flint Water Cases*, 960 F.3d at 329 (stating that during the Flint Water Crisis, Wurfel "repeatedly lied to the public and assured them that Flint River water was safe"). In fact, the allegations against O'Malley are particularly concerning because as the Water Plant Operator, O'Malley should have been intimately aware of the ramifications of lead in the water and the impact that providing false information to citizens could have. O'Malley's asserted actions more clearly resemble the types of actions that Wurfel took, most notably allegedly making repeated false statements to the public, rather than Lyon's sole indiscretion of attempting to undermine a single study about the Flint Water Crisis. At this stage in the proceedings, we conclude that the Plaintiffs' allegations against O'Malley, if taken as true, have plausibly asserted that O'Malley violated their right to bodily integrity. We therefore AFFIRM the district court's denial of O'Malley's motion to dismiss on the grounds of qualitied immunity.

## C. Municipal Liability

The Plaintiffs also brought a *Monell* claim against Benton Harbor, arguing that Muhammad, acting as the final decisionmaker for the city, had violated their right to bodily integrity pursuant to the Due Process Clause. The district court determined that the Plaintiffs had sufficiently alleged their *Monell* claim against the city, because the Plaintiffs had stated a substantive-due-process claim against Muhammad and the district court could plausibly infer that Muhammad, as the mayor, acted as the "final decisionmaker with regard to [the city's] public statements and communications." *Braziel*, 2023 WL 6304907, at *9. The district court focused only on Muhammad in reaching this decision, having determined that the Plaintiffs had not stated

21

a federal claim against City Manager Darwin Watson, *id.* at \*6, and had "fail[ed] to identify any specific conduct by" City Manager Ellis Mitchell, *id.* at \*8, the other two actors that the Plaintiffs named in their *Monell* claim. On appeal, the Plaintiffs likewise focus on only Muhammad. Appellees' Br. at 35–40. Accordingly, we focus on whether there is a *Monell* claim with regard to Muhammad's actions. On appeal, Benton Harbor asserts that the *Monell* claim cannot proceed because the Plaintiffs "have not sufficiently pled the existence of a constitutional violation by [] Muhammad." Appellants Br. at 22. The Plaintiffs argue that we do not have jurisdiction to consider an interlocutory appeal of the district court's decision regarding municipal liability, because the question of municipal liability "has no bearing on the Court's qualified immunity analysis." Appellees Br. at 38.

Individuals can sue a municipality for violating their constitutional or statutory rights when the alleged violation "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or was committed pursuant to a governmental custom, even if that custom was not formally approved. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690–91 (1978). Even a single unconstitutional act can subject a municipality to liability if it was taken by an authorized decisionmaker for the city. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Municipalities, however, cannot be held liable solely under a *respondeat superior* theory. *Bright v. Gallia County*, 753 F.3d 639, 660 (6th Cir. 2014).

The initial question is whether the Plaintiffs' municipal-liability claim is sufficiently connected with the qualified-immunity issues in this case such that we have appellate jurisdiction over the municipal-liability claim. Municipal-liability claims and qualified-immunity issues are "inextricably intertwined" with each other when resolving the qualified-immunity issue "would []

22

necessarily resolve the municipal-liability issue." *Courtright*, 839 F.3d at 523. For example, if a "plaintiff[] ha[s] failed to state a claim for violation of a constitutional right at all," then determining municipality's liability would require answering "precisely" the same question as the qualified-immunity inquiry posed. *See Mattox v. City of Forest Park*, 183 F.3d 515, 523–24 (6th Cir. 1999). In such a case, an interlocutory appeal would be appropriate. *Id.* In *Courtright*, on the other hand, we determined that we did not have jurisdiction over an interlocutory appeal regarding municipal liability for two reasons. First, the plaintiff had adequately alleged that the officers had violated his constitutional rights. 839 F.3d at 523–24. Second, although the qualified-immunity appeals there required evaluation of the individual officers' constitutional violations, determining the municipality's liability hinged on "its municipal policies, training programs, and customs." *Id.* Because determining one did "not necessarily determine" the other, we dismissed an appeal of municipal liability under *Monell* for lack of jurisdiction. *Id.* at 524.

Here, the *Monell* claim against Benton Harbor is "inextricably intertwined" with evaluating whether Muhammad is entitled to qualified immunity, and we therefore have jurisdiction over this interlocutory appeal to that extent. *Monell* claims do not always rise and fall with the allegations of a constitutional violation against any individual. *Grote v. Kenton County*, 85 F.4th 397, 415 (6th Cir. 2023). But in this instance, the fate of the *Monell* claim depends on the success of Plaintiffs' claim against Muhammad given their theory that Muhammad was the final decisionmaker as to the purportedly unconstitutional policy. *See Doe v. Claiborne County*, 103 F.3d 495, 512 (6th Cir. 1996). The district court found that the Plaintiffs had sufficiently alleged that Muhammad violated their substantive-due-process rights and, subsequently, that they had sufficiently stated a *Monell* claim against Benton Harbor. *Braziel*, 2023 WL 6304907, at *9. Reaching a decision on the municipal-liability claim hinges on whether Muhammad did, in fact,

commit such a violation, and whether Muhammad can be considered a final decisionmaker for the city, such that his unconstitutional action can be attributed to the city. Here, we have concluded that the Plaintiffs did not sufficiently plead that Muhammad had violated their substantive-due-process rights. Accordingly, the claim against the municipality is necessarily foreclosed insofar as the theory for municipal liability depends on finding that Muhammad committed a constitutional violation. *See Mattox*, 183 F.3d at 523–24. Because the Plaintiffs have not met their burden at the pleading stage for their claim that Muhammad violated their substantive-due-process rights, they likewise have not met their burden with respect to their claim against Benton Harbor on a municipal-liability theory based on Muhammad. We therefore REVERSE the district court's determination that the Plaintiffs had sufficiently alleged a *Monell* claim against Benton Harbor based on Muhammad.

## III. CONCLUSION

We REVERSE the district court's decision denying qualified immunity to Muhammad and concluding that the Plaintiffs had sufficiently alleged a claim of municipal liability based on Muhammad, AFFIRM the district court's decision denying qualified immunity to O'Malley, and REMAND for proceedings consistent with this opinion.

**NALBANDIAN, Circuit Judge, concurring in part and dissenting in part.** I agree with the majority opinion that the pleadings against Muhammad and Benton Harbor are insufficient to survive a motion to dismiss, and I join those parts of the opinion in full. But the allegations against O'Malley aren't sufficient either, so I would reverse the district court's decision to deny O'Malley qualified immunity as well.

## I.

Our court has recognized a bodily-integrity claim where we have found "conscience-shocking conduct" that violates a constitutional right. *Guertin v. Michigan*, 912 F.3d 907, 922 (6th Cir. 2019). Beyond the "mere negligence" we might accept in "run-of-the-mill tort claims," the constitutional claim requires plaintiffs to allege behavior that is truly "heinous." *Id.* at 923.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And because the plaintiffs base their claim here on alleged false statements to the public, for pleading purposes, this case is no different than a defamation case alleging false statements. The plaintiff must plead the particular statements they challenge as false. *See, e.g.*, *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Loc. 150*, 3 F.4th 866, 875 (6th Cir. 2021) ("A plaintiff claiming defamation must plead a defamation claim with specificity by *identifying the exact language* that the plaintiff alleges to be defamatory." (emphasis added) (quoting *Thomas M. Cooley L. Sch. v. Doe*, 833 N.W.2d 331, 341 (Mich. Ct. App. 2013))); *Bonn v. Tosoh Am. Inc.*, No. 2:23-cv-678, 2023 WL 6622239, at *2–3 (S.D. Ohio Oct. 11, 2023) (finding that the plaintiff failed "[t]o state a claim for defamation under Ohio law" because "[t]he [c]omplaint d[id] not identify the substance of the allegedly false statements made about him"); *Holloway Sportswear, Inc. v. Transp. Ins. Co.*, 177

F. Supp. 2d 764, (S.D. Ohio 2001) ("To state a claim for defamation under New York law, . . . [t]he plaintiff must also plead the actual words which were spoken or written." (citing *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 763 (2d Cir.1990)).

Here, the majority holds that the plaintiffs sufficiently pleaded their constitutional claim against O'Malley because the plaintiffs alleged "that O'Malley had repeatedly lied about the water crisis and, in doing so, had violated their right to bodily integrity." Maj. Op. at 19 n.8. But outside conclusory allegations that "O'Malley repeatedly denied, lied and covered up this public health emergency and crisis by repeatedly telling Benton Harbor residents and the public that the water was safe to drink," R. 82, 2d Am. Compl., p. 64, PageID 1177, the majority found only *one* false statement that the complaint attributed to O'Malley, Maj. Op. at 19 (citing *id.* at 40, PageID 1153; R. 146-19, Mot. to Dismiss, Ex. 18, p. 3, PageID 3184 (an email exchange with state employees that discussed the false statement)). According to the complaint:

> On or about January 9, 2019, State of Michigan Department of Environmental Quality EGLE Director Defendant Oswald was notified in an email from Isabel (Izzy) Marrah that Defendant Benton Harbor Water Plant and Distribution Director Michael O'Malleyhad [sic] told her that even in the homes that tested above the 15 ppb limit for lead, after the "first flush it was okay to drink and cook" the tap water because "they (Benton Harbor water supply) provide clean water right to their spout." This was a conscious and deliberately false statement by O'Malley.

R. 82, p. 40, PageID 1153 (emphasis omitted).

But the complaint makes no allegation that connects this statement to the plaintiffs or articulates how it violated any of *their* constitutional rights.[1] Nonetheless, the majority holds that

---

[1] The majority opinion quotes this exchange as what O'Malley "allegedly told a local resident" that then reached out to Marrah, "who works at a nonprofit called Freshwater Future." Maj. Op. at 19. But that's not what the complaint alleges. *See* R. 82, p. 40, PageID 1153. In the complaint, it was just a conversation between O'Malley and Marrah. *Id.*

this isolated statement to a single individual is sufficient to compare O'Malley to Bradley Wurfel, to whom we denied qualified immunity at the pleading stage after Wurfel allegedly "repeatedly lied to the public and assured them that Flint River water was safe." *In re Flint Water Cases*, 960 F.3d 303, 329 (6th Cir. 2020). The complaint in that case, however, gave actual details about Wurfel's alleged lies.

For example, Wurfel went on public radio on July 10, 2015, to tell listeners that the water was safe and not causing "any broad problem" with lead getting into residential water. Fourth Amended Complaint at 88, *In re Flint Water Cases*, 384 F. Supp. 3d 802 (E.D. Mich. 2019) (No. 5:16-cv-10444). On that broadcast, he allegedly told parents, "Let me start here—anyone who is concerned about lead in drinking water can relax." *Id.* Then in August, he publicly discredited a professor's announcement that there was lead, saying the professor's team "only just arrived in town and (have) quickly proven the theory they set out to prove," publicly accusing them of "fanning political flames irresponsibly." *Id.* at 92. And that September, he "stated publicly that the Flint water crisis was becoming 'near-hysteria'" and "finished his remarks that day by falsely stating that 'Flint's drinking water is safe in that it's meeting state and federal standards.'" *Id.* at 94. The complaint in that case made numerous other detailed allegations about Wurfel, his statements, and his conscience-shocking personal conduct. *See e.g.*, *id.* at 88–92, 94, 103, 155. O'Malley, on the other hand, faces nothing of the like.

The proper analogue from the *Flint Water Cases* is Nick Lyon, the director of the Michigan Department of Health and Human Services (MDHHS), who allegedly knew about elevated blood

---

And there's no allegation that this statement even affected Marrah—the only person alleged to have heard this false statement from O'Malley—because despite the district court's inference to the contrary, *see Braziel v. Whitmer*, No. 1:21-cv-960, 2023 WL 6304907, at *5 (W.D. Mich. Sept. 28, 2023), plaintiffs didn't plead that Marrah was ever a resident of Benton Harbor.

lead levels but "did nothing to report the findings" and made no "order that any action be taken to warn the public." *Id.* at 92. When Dr. Mona Hanna-Attisha published a study citing data from a local hospital that "observed a similar spike in the percentage of Flint children with elevated blood lead levels," Lyon, rather than investigate, allegedly directed his staff to make a "strong statement with a demonstration of proof that the lead blood levels seen are not [out] of the ordinary and are attributable to seasonal fluctuations," and the complaint claimed that "the MDHHS immediately accused Dr. Hanna-Attisha of providing false information to the public." *Id.* at 93.

If anything, the allegations against Lyon were more detailed and stronger overall than the allegations against O'Malley, but we still interpreted the pleadings as alleging "a general 'failure to "protect and notify the public" of the problems with Flint's water,' rather than alleg[ing] particular action taken by Lyon . . . that would demonstrate [his] deliberate indifference." *In re Flint Water Cases*, 960 F.3d at 331 (quoting *Guertin*, 912 F.3d at 930). So we said his conduct fell "well-short of conscience-shocking" and that the district court erred by denying his motion to dismiss. *Guertin*, 912 F.3d at 930–31. I would hold that the district court here made the same error by denying O'Malley's motion to dismiss.

All in all, the plaintiffs have failed to state a claim that O'Malley violated their constitutional right to bodily integrity. The only non-conclusory fact they allege against O'Malley is that he made one isolated false statement to one individual with no connection to any plaintiff. Even accepting the complaint's factual matter as true, *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570), the plaintiffs have failed to state a claim that O'Malley engaged in any conscience-shocking conduct that violated any of their constitutional rights.

For these reasons, I respectfully dissent in part.